No. 3:16-cv-00310

---

In the United States Court for the Middle District of Louisiana

---

---

Dallas Staden, Petitioner

*v.*

Troy Poret, Warden

---

**Petition for a Writ of Habeas Corpus
by a Prisoner in State Custody**

---

**MANASSEH, GILL, KNIPE &
BÉLANGER, P.L.C.**

CAITLIN M. A. CHUGG
Louisiana State Bar Roll No. 35708
8075 Jefferson Highway
Baton Rouge, LA 70809
Tel: (225) 383-9703
Fax: (225) 383-9704
Email: caitlin@manassehandgill.com
*Attorney for Dallas Staden*

---

## TABLE OF CONTENTS

INFORMATION REQUESTED IN MODEL FORM FOR USE IN APPLICATIONS
FOR HABEAS CORPUS UNDER 28 U.S.C. § 2254....................................................................3
STATEMENT OF THE CASE....................................................................................................16
AEDPA STANDARD OF REVIEW ..........................................................................................19
TIMELINESS .............................................................................................................................20
EXHAUSTION ...........................................................................................................................21
DISCUSSION .............................................................................................................................23
      Fundamental Miscarriage of Justice ...........................................................................23
      Prosecutorial Misconduct and *Brady* Violations ......................................................26
      Sixth Amendment Violations.......................................................................................39
      Right to Fair Trial Violated..........................................................................................55
CONCLUSION............................................................................................................................65
CERTIFICATE OF SERVICE ...................................................................................................68

**PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

| United States District Court | District: Middle District of Louisiana |
|---|---|
| Name: Dallas Staden | Docket No. |
| Place of Confinement:<br>Avoyelles Correctional Center | DOC No. 522987 |
| Petitioner                            Respondent<br><br>     Dallas Staden        v.     Troy Poret, Warden<br>                    Avoyelles Correctional Center<br>                    Cottonport, LA | |
| The Attorney General of the State of: Louisiana | |

PETITION

1.  (a) Name and location of court that entered the judgment of conviction you are challenging:

    The Nineteenth Judicial District Court in the Parish of East Baton Rouge.

    (b) Criminal docket or case number:

    02-10-0403.

2.  (a) Date of the judgment of conviction:

    November 10, 2010.

    (b) Date of sentencing:

    May 16, 2011.

3.  Length of sentence:

    Forty-nine and one-half (49 ½) years.

4.  In this case, were you convicted on more than one count or of more than one crime?

    No.

5.  Identify all crimes of which you were convicted and sentenced in this case:

Armed Robbery.

6. (a) What was your plea?

Not Guilty.

(b) If you entered a guilty plea to one count or charge and not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to?

N/A.

(c) If you went to trial, what kind of trial did you have?

Bench Trial.

7. Did you testify at a pretrial hearing, trial, or a post-trial hearing?

Yes.

8. Did you appeal from the judgment of conviction?

Yes.

9. If you did appeal, please answer the following:

a) Name of the court: First Circuit Court of Appeal

b) Docket or case number: 2011-KA-1455.

c) Result: Denied.

d) Date of result: May 3, 2012.

e) Citation to the case: *State v. Staden*, 2011-1455 (La.App. 1 Cir. 5/3/12). writ

denied, 2012-1259 (La. 11/16/12); 102 So.3d 31.

f) Grounds raised: (1) Denial of right to jury trial and standby counsel appointment; (2) insufficient evidence to support conviction; (3) Trial Court's error in denial of Motion for Speedy Trial and in second felony habitual offender adjudication; and (4) denial of effective assistance of counsel.

g) Did you seek further review by a higher state court? Yes

If yes, answer the following:

1) Name of court: Louisiana Supreme Court.

2) Docket or case number: 2012-KO-1259.

3) Result: Denied.

4) Date of result: November 16, 2012.

5) Citation to the case: *State v. Staden*, 2012-1259 (La. 11/16/12); 102 So.3d 31.

6) Grounds raised: (1) Denial of right to jury trial and standby counsel appointment; (2) insufficient evidence to support conviction; (3) Trial Court's error in denial of Motion for Speedy Trial and in second felony habitual offender adjudication; and (4) denial of effective assistance of counsel.

h) Did you file the petition for certiorari in the United States Supreme Court?

1) Docket or case number: No.

2) Result: N/A.

3) Date of result: N/A.

4) Citation to the case: N/A.

10. Other than the direct appeals listed above, have you previously filed any other petitions, applications or motions concerning this judgment of conviction in any state court?

Yes, filed state Application for Post-Conviction Relief.

11. (a) If your answer to Question 10 was "Yes", give the following information:

1) Name of court: 19 Judicial District Court.

2) Docket or case number: 02-10-0403.

3) Date of filing: May 7, 2013.

4) Nature of the proceeding: Application for Post-Conviction Relief.

5) Grounds raised: (1) New trial was warranted due to the recantation of testimony by State's witness, Thanh Nam Nguyen; (2) deprivation of right to fair trial by denial of right to due process and denial of right to self-

representation; (3) violation of right to judicial review; and (4) denial to right of compulsory process.

6) Did you receive a hearing where evidence was given on your petition, application or motion? No.

7) Result: Denied.

8) Date of result: November 20, 2013.

(b) If you filed any motion, give the same information:

1) Name of court: Louisiana First Circuit Court of Appeals.

2) Docket or case number: 2014-KW-0622.

3) Date of filing: January 14, 2014.

4) Nature of the proceeding: Petition for Post-Conviction Relief.

5) Grounds raised: (1) New trial was warranted due to the recantation of testimony by State's witness, Thanh Nam Nguyen; (2) deprivation of right to fair trial by denial of right to due process and denial of right to self-representation; (3) violation of right to judicial review; and (4) denial to right of compulsory process.

6) Did you receive a hearing where evidence was given on your petition, application, or motion? No.

7) Result: Writ Application Denied.

8) Date of result: April 8, 2014.

(c) If you filed any third motion, give the same information:

1) Name of court: Louisiana State Supreme Court

2) Docket or case number: 2014-KH-1770.

3) Date of filing: July 15, 2014.

4) Nature of the proceeding: Application for Post-Conviction Relief.

5) Grounds raised: (1) New trial was warranted due to the recantation of testimony by State's witness, Thanh Nam Nguyen; (2) deprivation of right to fair trial by denial of right to due process and denial of right to self-

6

representation; (3) violation of right to judicial review; and (4) denial to right of compulsory process.

6) Did you receive a hearing where evidence was given on your petition, application or motion? No.

7) Result: Writ Application Denied.

8) Date of result: July 31, 2015.

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application or motion?

First Petition: Yes. *See* information included above.

12. For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

**Ground One: Fundamental Miscarriage of Justice**

(a) Supporting Facts (Do not argue or cite law. Just state the specific facts that support your claim.):

The state courts' failure to adjudicate Mr. Staden's claims on the merits resulted in a fundamental miscarriage of justice and now may be reviewed *de novo*.

(b) If you did not exhaust your state remedies on Ground One, explain why:

The state courts' adjudication of Mr. Staden's claims was primarily procedural.

(c) Direct Appeal of Ground One: No.

(1) If you appealed from the judgment of conviction, did you raise the issue? No.

(2) If you did not raise the issue in your direct appeal, explain why:

The supporting grounds asserted in the fundamental miscarriage of justice claim were unknown to the petitioner at the time of his direct appeal.

(d) Post-Conviction Proceedings:

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial count? Yes.

(2) If your answer to Question (d)(1) is "Yes", state:

Type of motion or petition: Application for Post-Conviction Relief.

Name and location of the court where the motion or petition was filed: 19th Judicial District Court, Baton Rouge, Louisiana.

Docket or case number: 02-10-0403.

Date of the court's decision: November 20, 2013.

Result (attach a copy of the court's opinion or order): Denied.

(3) Did you receive a hearing on your motion or petition? No.

(4) Did you appeal from the denial of your motion or petition? Yes.

(5) If your answer to Question (d)(4) is "Yes", did you raise this issue in the appeal? Yes.

(6) If your answer to Question (d)(4) is "Yes", state:

Name and location of the court where the appeal was filed: Louisiana First Circuit Court of Appeal.

Docket or case number: 2011-KA-1455.

Date of the court's decision: May 3, 2012.

Result (attach a copy of the court's opinion or order): Denied.

(7) If your answer to Question (d)(4) or Question (d)(5) is "No", explain why you did not raise this issue: N/A.

(e) Other Remedies: Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One: N/A.

**Ground Two: Prosecutorial Misconduct and *Brady* Violations**

(a) Supporting Facts (Do not argue or cite law. Just state the specific facts that support your claim.):

In post-conviction, Petitioner learned the State's Assistant District Attorney dismissed a defense witness. The State further failed to disclose the Louisiana Attorney General's pending investigation into one of the State's primary witnesses, Thanh Nguyen, at the time of Petitioner's prosecution, in violation of *Brady*. The Assistant District Attorney failed to correct knowingly false testimony.

(b)  If you did not exhaust your state remedies on Ground Two, explain why:

The claims asserted herein were unknown to Petitioner until post-conviction; thus, Petitioner believes in good faith this Honorable Court may review these claims *de novo*.

(c)  Direct Appeal of Ground Two:

(1)  If you appealed from the judgment of conviction, did you raise the issue? No.

(2)  If you did not raise the issue in your direct appeal, explain why: The issue was unknown to the petitioner until post-conviction.

(d)  Post-Conviction Proceedings:

(1)  Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial count? Yes.

(2)  If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: Application for Post-Conviction Relief.

Name and location of the court where the motion or petition was filed: 19th Judicial District Court, Baton Rouge, Louisiana.

Docket or case number: 02-10-0403.

Date of the court's decision: November 20, 2013.

Result (attach a copy of the court's opinion or order): Denied.

(3)  Did you receive a hearing on your motion or petition? No.

(4)  Did you appeal from the denial of your motion or petition? Yes.

(5)  If your answer to Question (d)(4) is "Yes", did you raise this issue in the appeal? Yes.

(6) If your answer to Question (d)(4) is "Yes", state:

      Name and location of the court where the appeal was filed:
      Louisiana First Circuit Court of Appeal.

      Docket or case number: 2014-KW-0622.

      Date of the court's decision:  April 8, 2014.

      Result (attach a copy of the court's opinion or order): Denied.

(7) If your answer to Question (d)(4) or Question (d)(5) is "No", explain why you did not raise this issue: N/A.

(e) Other Remedies: Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four: N/A.

**Ground Three: Sixth Amendment Violations**

(a) Supporting Facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Petitioner was denied the right to self-representation by the trial court's appointment of Mr. Steven Moore as standby counsel. Because of the limited nature of the position of standby counsel, from which Mr. Moore could do essentially nothing to aid in the Petitioner's defense, Petitioner was denied the effective assistance of counsel. Standby counsel then deprived Petitioner of his Sixth Amendment right to self-representation by dismissing lay witnesses who appeared to testify on Petitioner's behalf at trial without Petitioner's knowledge or permission. Standby counsel interfered with Petitioner's right to remain in complete control of his own defense by examining and cross examining witnesses and appearing in Petitioner's stead at numerous bench and chambers conferences.

(b) If you did not exhaust your state remedies on Ground Three, explain why:

The above claims were exhausted at the State level under the claims of ineffective assistance of counsel and denial of right to self-representation. However, undersigned counsel expounds upon the earlier asserted claims with greater factual support to challenge the full scope of the Sixth Amendment violations.

(c) Direct Appeal of Ground Three:

(1) If you appealed from the judgment of conviction, did you raise the issue? Yes.

(2) If you did not raise the issue in your direct appeal, explain why: N/A.

(d) Post-Conviction Proceedings:

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial count? Yes.

(2) If your answer to Question (d)(1) is "Yes", state:

Type of motion or petition: Application for Post-Conviction Relief

Name and location of the court where the motion or petition was filed: 19th Judicial District Court for the Parish of East Baton Rouge, LA.

Docket or case number: 02-10-0403.

Date of the court's decision: November 20, 2013

Result (attach a copy of the court's opinion or order): Relief denied.

(3) Did you receive a hearing on your motion or petition? No.

(4) Did you appeal from the denial of your motion or petition? Yes.

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? Yes.

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: Louisiana First Circuit Court of Appeal.

Docket or case number: 2011-KA-1455.

Date of the court's decision: May 3, 2012.

Result (attach a copy of the court's opinion or order): Denied.

(7) If your answer to Question (d)(4) or Question (d)(5) is "No", explain why you did not raise this issue: N/A.

(e) Other Remedies: Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two: N/A.

**Ground Four: Right to Fair Trial Violated**

(f) Supporting Facts (Do not argue or cite law. Just state the specific facts that support your claim.):

The cumulative actions of the State and court-appointed standby counsel denied Petitioner the right to a fair trial and due process of law. The actions of the trial court, refusing the impeachment of a hostile witness, repeatedly failing to accept Petitioner's desire to represent himself and general demeanor towards Petitioner all indicate partiality and thus deprived him of a fair trial and due process of law.

(g) If you did not exhaust your state remedies on Ground Four, explain why:

The above claim for denial of right to fair trial was exhausted at the State level. However, undersigned counsel expounds upon the earlier asserted claims with greater factual support to challenge the full scope of the denial of right to fair trial.

(h) Direct Appeal of Ground Four:

(3) If you appealed from the judgment of conviction, did you raise the issue? No.

(4) If you did not raise the issue in your direct appeal, explain why: The underlying facts were unknown to petitioner until the post-conviction process.  The claims were raised in the Application of Post-Conviction Relief.

(i) Post-Conviction Proceedings:

(8) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial count? Yes.

(9) If your answer to Question (d)(1) is "Yes", state:

Type of motion or petition: Application for Post-Conviction Relief

Name and location of the court where the motion or petition was filed: 19th Judicial District Court for the Parish of East Baton Rouge, LA.

Docket or case number: 02-10-0403.

Date of the court's decision: November 20, 2013

Result (attach a copy of the court's opinion or order): Relief denied.

(10)    Did you receive a hearing on your motion or petition? No.

(11)    Did you appeal from the denial of your motion or petition? Yes.

(12)    If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? Yes.

(13)    If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: Louisiana First Circuit Court of Appeal.

Docket or case number: 2011-KA-1455.

Date of the court's decision: May 3, 2012.

Result (attach a copy of the court's opinion or order): Denied.

(14)    If your answer to Question (d)(4) or Question (d)(5) is "No", explain why you did not raise this issue: N/A.

(j) Other Remedies: Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two: N/A.

13. Please answer these additional questions about the petition you are filing:

(a) Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction?

No.

If your answer is "No", state which grounds have not been so presented and give your reason(s) for not presenting them:

The grounds not presented previously are denial of right to a fair trial, Sixth Amendment Violations, prosecutorial misconduct, and *Brady* violations. These grounds were raised in part at the state level, but were not fully developed until the instant Petitions.

(b) If there is any ground in this petition that has not been presented in some state or federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

The grounds not presented previously are denial of right to a fair trial, Sixth Amendment Violations, prosecutorial misconduct, and *Brady* violations. These grounds were raised in part at the state level, but were not fully developed until the instant Petitions. These claims were not presented because petitioner was unaware of all the facts supporting the grounds for relief asserted herein until post-conviction. These grounds are fully developed herein.

14. Have you previously filed any type of petition, application, or motion in federal court regarding the conviction that you challenge in this petition? No.

If "Yes", state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy of any court opinion or order, if available. N/A.

15. Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging? No.

If "Yes", state the name and location of the court, the docket or case number, the type of proceeding and the issues raised.

16. Give the name and address of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: Ms. Sonya Hall, 658 Saint Charles Street, Baton Rouge, LA 70802.

(b) At arraignment ~~and plea~~: *pro se*.

(c) At trial: *pro se* with court-appointed standby counsel, Mr. Steven J. Moore, 6513 Perkins Road, Baton Rouge, LA 70808.

(d) At sentencing: *pro se* with court-appointed standby counsel, Mr. Steven J. Moore, 6513 Perkins Road, Baton Rouge, LA 70808; at habitual offender arraignment and plea: Mr. Francis 'Bo' Rougeou, 1040 Main Street, Baton Rouge, LA 70802.

(e) On appeal: *pro se* and with Mr. Bruce Whitaker, P.O. Box 791984, New Orleans, LA 70179-1984.

(f) In any post-conviction proceeding: Mr. Joseph Rodney Messina, 216 East Boulevard, Baton Rouge, LA 70802.

(g) On appeal from any ruling against you in a post-conviction proceeding: *pro se*.

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging? No.

    (a) If so, give name and location of court that imposed the other sentence you will serve in the future: N/A.

    (b) Give the date the other sentence was imposed: N/A.

    (c) Give the length of the other sentence: N/A.

    (d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future? No.

## STATEMENT OF THE CASE

### Statement of the Facts

On December 1, 2009, petitioner Dallas Staden entered Alby's Market and Deli (Alby's) on North Sherwood Forest Boulevard in Baton Rouge, approached the check-cashing station and questioned a store employee, Sam Tran, about a power of attorney form needed to cash a third party's check. Moments later, Petitioner's brother, Jeffrey Staden, entered the store with several unidentified confederates, approached the check-cashing station and, suddenly moving the petitioner aside, aimed a gun at Tran's face. Simultaneously, an unknown gunman held another store employee, Thanh Nguyen, at gunpoint.

Jeffrey Staden threw a bag to the petitioner, who, while held at gunpoint by another perpetrator, retrieved and placed premade zip ties, contained in the bag, around Tran's and Nguyen's wrists before placing a white plastic bag over Tran's head. Jeffrey Staden jumped over the counter and hit Tran in the head with the gun when Tran failed to comply with his command to get on the floor. Tran, dizzy and bleeding, fell to the floor. The gunmen took cash from the store's cash registers but also wanted money from the safe. Tran informed Jeffrey Staden that the safe would not open immediately because of its time lock feature. After repeatedly striking him with the gun, Jeffrey Staden shot Tran in the back of his right leg and continued to question him about the safe. At this point, one of the unknown gunmen told Jeffrey Staden that they had to go and could not wait for the safe to open. Jeffrey Staden and the unknown assailants then fled the store.

Once his older brother and the unknown assailants fled, Dallas Staden dragged Thanh Nguyen toward Tran, loosening and untying the zip ties on Nguyen. Nguyen grabbed a gun located behind the store counter and pursued the fleeing perpetrators, firing twice. Petitioner

removed the plastic bag from Tran's head, apologizing to him. Petitioner shouted warnings to the perpetrators that Nguyen had a gun and, shortly thereafter, left Alby's on his own.

Immediately after the robbery, Sam Tran was taken to the hospital for gunshot wound treatment. While receiving emergency medical care, Tran was questioned by Detective Walters, who advised Tran that the petitioner was a suspect. Det. Walters returned to the hospital two to three days later and presented Tran with a photo line-up. Before the photo line-up and his conversation with Detective Walters, in which he learned the petitioner's familial relationship to the known perpetrator, Jeffrey Staden, Sam Tran believed that the petitioner was simply a customer. He identified the petitioner as "Dallas" who comes into his store often; he knew him as a customer, from prior transactions at the Alby's check cashing counter.

Sam Tran's initial statements to police indicated that the petitioner entered the store but did not have anything to do with the robbery. Mr. Tran agreed, based on Detective Walters' statements, that the petitioner might have been a "distraction." It was Detective Walters who suggested to Mr. Tran and identified the petitioner as a "suspect." The petitioner had been in the store on a number of prior occasions, transacted business there and knew Sam Tran well.

## Procedural History

Dallas Staden was subsequently arrested and formally charged by Bill of Information, under East Baton Rouge Docket No. 02-10-403, with Attempted Second Degree Murder (count one) and Armed Robbery (count two), violations of La. R.S. 14:27, La. R.S. 14:30 and La. R.S. 14:64, respectively. R. 12-14.[1] On numerous occasions, Petitioner waived his right to counsel, terminating representation by the Office of the Public Defender. R. 292, 303, 309, 315. Nonetheless, the trial court appointed Mr. Steven Moore as standby counsel. See R. 435.

---

[1] Petitioner hereby incorporates by reference thereto the entire Record of 19th Judicial District Court docket no. 02-10-0403 and requests that the same be attached to the instant Petition for Writ of Habeas Corpus.

Petitioner waived his right to a jury trial and, on November 9 and 10, 2010, a bench trial was held before the Honorable Judge Anthony J. Marabella, Jr. Petitioner testified on his own behalf at trial. On November 10, 2010, Petitioner was found not guilty as to count one, Attempted Second Degree Murder, and guilty as charged to count two, Armed Robbery. The State instituted habitual offender proceedings against the petitioner. R. 801.

Post-verdict motions were heard and denied on March 15, 2011. The trial court appointed Francis 'Bo' Rougeou to represent the petitioner in the habitual offender proceedings; Petitioner pled guilty and waived all sentencing delays. R. 810-12. On May 16, 2011, Petitioner reconsidered his habitual offender stipulation and was subsequently adjudicated a second felony offender after hearing. R. 834. Petitioner was immediately sentenced as a habitual offender to the mandatory minimum sentence of 49 and ½ years imprisonment without the benefit of probation, parole or suspension of sentence. R. 837.

Petitioner appealed his conviction and sentence, assigning error in a counseled brief to the waiver of the right to a jury trial and to the trial court's standby counsel appointment. Petitioner also requested a review of the record pursuant to La. Code of Criminal Procedure art. 920(2): Scope of Appellate Review. In a supplemental *pro se* brief, Petitioner assigned error to the sufficiency of the evidence, the Trial Court's denial of his Motion for Speedy Trial, ineffective assistance of counsel and the second felony habitual offender adjudication. On May 3, 2012, the Louisiana Court of Appeal, First Circuit, affirmed his conviction, habitual offender adjudication and sentence. *State v. Staden*, 2011-1455 (La.App. 1 Cir. 5/3/12). writ denied, 2012-1259 (La. 11/16/12); 102 So.3d 31. The Louisiana Supreme Court denied writs on November 16, 2012. *Ibid.*

18

On May 7, 2013, Petitioner filed his Application for Post-Conviction Relief, asserting a new trial was warranted due to Thanh Nyugen's desire to recant his testimony; Petitioner's right to a fair trial was violated by the interference with and ultimate dismissal of material witnesses by trial court's appointed standby counsel; the Court's failure to create, prepare and maintain a complete record of his case violated the petitioner's right to judicial review; and Petitioner's right to compulsory process was violated by the dismissal of material witnesses. On November 20, 2013, the Honorable Judge Anthony J. Marabella, Jr., in accord with Commissioner Nicole L. Robinson's Recommendation, denied and dismissed the petitioner's Application for Post-Conviction Relief. The Louisiana Court of Appeal, First Circuit upheld Petitioner's conviction, habitual offender adjudication and sentence on April 8, 2014 and the Louisiana Supreme Court denied writs on July 31, 2015. *State ex rel. Staden v. State*, 2014-1770 (La. 7/31/15); 174 So.3d 1147. Neither court issued written reasons for denying Petitioner's writs. Having exhausted all remedies available to him in the courts of the State, Petitioner now comes to this Honorable Court for relief.

## **AEDPA STANDARD OF REVIEW**

Questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1), while pure questions of fact are reviewed under § 2254(d)(2). *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). The state court's decision is contrary to federal law within the meaning of § 2254(d)(1) when the state court applies a rule contradicting the governing law set forth in the Supreme Court's jurisprudence or the state court "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Ibid. See Williams v. Taylor*, 529 U.S. 362, 405-06; 120 S. Ct. 1495; 146 L. Ed. 2d 389 (2000). The inquiry into the issue of

"unreasonableness" is objective. *Id*. at 409-10. A state court's incorrect application of clearly established Supreme Court precedent is not enough to warrant federal habeas relief – the application must also be unreasonable. *Id*. at 410-12. A state court's factual findings constitute "an unreasonable application of clearly established" Supreme Court precedent if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407-08.

<u>**Timeliness**</u>

Title 28 U.S.C. § 2254 provides a one-year limit for the filing of an application for a Writ of Habeas Corpus in federal court. *See* 28 U.S.C. § 2244(d)(1). The limitation period commences from the latest of:

> (A) *The date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;*
> (B) The date on which the impediment to filing an application created by the State action in violation of the Constitution or the laws of the United States is removed, if the applicant was prevented from filing by such State action;
> (C) The date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> (D) The date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

*Ibid.* (emphasis added).

Furthermore, "the time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2). The one year time limitation imposed by § 2244(d)(1)(A) begins to commence on "the date on which the judgment becomes final by the conclusion of direct review." A state prisoner's conviction becomes "final" for the purposes of § 2254 ninety (90) days after the judgment is entered, when the time to file a petition for writ of certiorari with the U.S. Supreme Court has expired. *Roberts*

*v. Cockrell*, 319 F.3d 690, 693 (5ᵗʰ Cir. 2003). A pending state habeas or post-conviction proceeding tolls the statute of limitations created by § 2244(d)(1). *Ybanez v. Johnson*, 204 F.3d 645, 646 (5ᵗʰ Cir. 2000). "[A] state application is 'pending during the intervals between the state court's disposition of a state habeas and the petitioner's timely filing of a petition for review to the next level." *Dixon v. Cain*, 316 F.3d 553, 556 (5ᵗʰ Cir. 2003).

Petitioner's conviction became final on February 14, 2013, ninety days after the Louisiana Supreme Court upheld Petitioner's conviction with a denial of rehearing on November 16, 2012. *State v. Staden*, 2012-1259 (La. 11/16/12); 102 So.3d 31. Petitioner filed his Application for Post-Conviction Relief on May 7, 2013, after a lapse of 82 days, leaving petitioner 283 days of federal time. The Louisiana Supreme Court upheld Petitioner's conviction, habitual offender adjudication and sentence on July 31, 2015. *State ex rel. Staden v. State*, 2014-1770 (La. 7/31/15); 174 So.3d 1147. Petitioner's federal clock resumed immediately thereafter, yielding an expiration of Petitioner's time on May 9, 2016. Therefore, Petitioner's instant Petition is timely filed.

## Exhaustion

Applicants seeking Federal Habeas relief under 28 U.S.C. § 2254 are required to exhaust all claims in state court prior to requesting federal collateral relief. *Mercandel v. Cain*, 179 F.3d 271, 275 (5ᵗʰ Cir. 1999). "The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court." *Armsted v. Maggio*, 720 F.2d 894, 896 (5ᵗʰ Cir. 1983). Habeas claims can be exhausted for § 2254 purposes during either direct appeal or state post-conviction review. *Garner v. Cain*, 99-3272 "G", 2000 U.S. Dist. LEXIS 6451 (E.D. La. May 1, 2000) (finding raised by petitioner on direct appeal "properly exhausted and ripe for habeas review"). Petitioner's Petition for Post-Conviction

Relief and his subsequent request for Remedial and/or Supervisory Writs fairly presented the facts and law of Petitioner's Federal Habeas claims enumerated herein. Although exhaustion inquiries are fact-specific, "as a general rule dismissal is not required when evidence presented for the first time in a habeas proceeding supplements, but does not fundamentally alter, the claim presented to the state courts." *Anderson v. Johnson*, 338 F.3d 382, 386 (5th Cir. 2003).

Not all of Petitioner's claims were adjudicated on the merits before the 19th Judicial District Court; some were adjudicated on procedural grounds alone. An evidentiary hearing was denied. The phrase "adjudicated on the merits" as it appears in 28 U.S.C. § 2254 "does not require that state have conducted evidentiary hearing, or indeed, any particular kind of hearing; state has 'adjudicated' petitioner's constitutional claim 'on the merits' for the purposes of 28 U.S.C. § 2254(d) when it has decided petitioner's right to post-conviction relief on the basis of substance of constitutional claim advanced, rather than denying claim on the basis of procedural or other rule precluding state court review of the merits." *See generally*, *Lambert v. Blodgett*, 393 F.3d 943, 965-966 (9th Cir. 2004).

As will be noted *infra*, the Louisiana Supreme Court's disposition of Petitioner's application for post-conviction relief represents a severe departure from clearly established federal law, as determined by the Supreme Court of the United States, an unreasonable determination of facts in light of the evidence presented in the State court proceedings and an unreasonable application of Supreme Court jurisprudence. This Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 follows.

<u>**DISCUSSION**</u>

**I. FUNDAMENTAL MISCARRIAGE OF JUSTICE**

<u>**Federal Law on Standard of Review for Petitions Filed under 28 U.S.C. §2254**</u>

In order for this Honorable Court to hear the claims asserted herein, they must have been adjudicated on the merits. "In the context of federal habeas proceedings, a resolution (or adjudication) on the merits is a term of art that refers to whether a court's disposition of the case was substantive, as opposed to procedural." *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir.2000), citing *Green v. Johnson*, 116 F.3d 1115, 1121 (5th Cir.1997). In determining whether claims were adjudicated on the merits, the *Miller* court considered the following factors:

> (1) what state courts have done in similar cases; (2) whether the case's history suggests that the state court recognized any ground for not resolving the case on the merits; and (3) whether the state courts' opinions suggest reliance on procedural grounds rather than an adjudication of the merits.

*Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir.2000). Therefore, when relief is denied due to state courts' reliance on procedural grounds for denial, it seems that for the purposes of habeas review, the claims have not been fully adjudicated on their merits. "With respect to claims that were not adjudicated on the merits in state court, the deferential AEDPA standards of review do not apply." *Henderson v. Cockrell*, 333 F.3d 592, 598 (5th Cir.2003). If the adjudication on the merits is unclear or incomplete, the review is *de novo*. *See generally Nobles v. Johnson*, 127 F.3d 409, 416 (5th Cir.1997).

This Honorable Court has discretionary authority to entertain claims Mr. Staden may not have raised on appeal or in state post-conviction proceedings, if the fundamental miscarriage of justice will result from the refusal to hear these claims.

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state

> procedural rule, federal habeas review of the claims is barred
> **unless the prisoner can demonstrate cause for the default and**
> **actual prejudice as a result of the alleged violation of federal**
> **law, or demonstrate that failure to consider the claims will**
> **result in a fundamental miscarriage of justice.**

*Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991)

holding modified by *Martinez v. Ryan*, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012) (emphasis

added).

> To excuse his failure to raise the claim earlier, he must show cause
> for failing to raise it and prejudice therefrom as those concepts
> have been defined in our procedural default decisions. The
> petitioner's opportunity to meet the burden of cause and prejudice
> will not include an evidentiary hearing if the district court
> determines as a matter of law that petitioner cannot satisfy the
> standard. **If petitioner cannot show cause, the failure to raise**
> **the claim in an earlier petition may nonetheless be excused if**
> **he or she can show that a fundamental miscarriage of justice**
> **would result from a failure to entertain the claim.**

*McCleskey v. Zant*, 499 U.S. 467, 494-95, 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991)

(emphasis added).

Not all of the claims herein have been fully adjudicated on the merits; those that have not

been are therefore subject to *de novo* review by this Honorable Court. Not reviewing Mr.

Staden's instant claims on their merits would undoubtedly result in the fundamental miscarriage

of justice.

**Facts in Support of Grounds for Relief**

The denial of Mr. Staden's Application for Post-Conviction Relief on procedural grounds barred
final adjudication on the merits thereof, resulting in a fundamental miscarriage of justice.

Dallas Staden filed an Application for Post-Conviction Relief in the 19th Judicial District

Court on April 30, 2013. See Application for Post-Conviction Relief, filed on May 7, 2013. The

State filed State's Procedural Objections to Application for Post Conviction Relief [sic] on July

17, 2013. See State's Procedural Objections to Application for Post Conviction Relief, filed on

July 17, 2013. Commissioner Nicole L. Robinson recommended to the court that Mr. Staden's

Application be denied on procedural grounds. See Commissioner's Recommendation, filed on

July 26, 2013. Concurring with the commissioner's conclusion, the Court denied Mr. Staden's

Application for Post-Conviction Relief on November 20, 2013 for the following reasons:

- Mr. Staden's first claim for post-conviction relief (moving for a new trial) relied upon new evidence which would have been the recantation of testimony by material State witness, Thanh Nguyen; the Court, in following the Commissioner's recommendations, held Mr. Staden would be unable to support this claim with facts due to the lack of evidence supplied with the Application. See Order, signed on November 20, 2013, page 2-3.

- Mr. Staden's claim asserting the denial of his right to a fair trial by the dismissal of defense witnesses without his knowledge, was likewise dismissed for lack of evidence supporting the claim. See Order, signed on November 20, 2013, pages 1-2.

- Mr. Staden's claim that standby counsel interfered with his Sixth Amendment right to self-representation was dismissed as procedurally barred for being finally litigated on direct appeal. See Order, signed on November 20, 2013, page 2.

- Mr. Staden's claim regarding the denial of his right to meaningful review due to the incomplete transcription of his trial was dismissed for being fully litigated on direct appeal. See Order, signed on November 20, 2013, page 2.

- Mr. Staden's claim asserting standby counsel's interference with his witnesses, resulting in a violation of his right to compulsory process and in the interest of justice, was dismissed for lack of factual basis. See Order, signed on November 20, 2013, page 1-2.

*See also* Commissioner's Recommendation, filed on July 26, 2013.[2] The denial of Mr. Staden's Application for Post-Conviction Relief was strictly procedural, on all grounds asserted therein. Because the Application for Post-Conviction Relief was **not** adjudicated on the merits, but rather denied on procedural grounds, Mr. Staden is entitled to a *de novo* review of the claims presented herein. As demonstrated herein, refusal to entertain Mr. Staden's claims would result in the fundamental miscarriage of justice.

## II. PROSECUTORIAL MISCONDUCT

### Federal Law on Prosecutorial Misconduct

In *Brady v. Maryland*, the U.S. Supreme Court held that a defendant's due process would be violated if the prosecution withheld evidence that tended to be exculpatory to the defendant, 373 U.S. 83, 87 (1963). Although *Brady* is considered to have established the framework for guidelines by which the prosecution must act to ensure the due process of a defendant is not violated, a similar ruling was handed down several years prior:

> It is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured. Such a contrivance by a state to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation.

*Mooney v. Holohan*, 294 U.S. 103, 112 (1935). The *Brady* Court expanded *Mooney*, explicitly, ruling "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." *Brady* at 87. The Court echoed this sentiment in *Napue v. People of State of Illinois*:

---

[2] Note that the trial court adopted and incorporated by reference thereto the Commissioner's Recommendation in its Order denying Mr. Staden's Application for Post-Conviction Relief. See Order, page. 1.

> **The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness.** The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and **it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.**

360 U.S. 264, 269 (1959) (emphasis added).

Following *Brady*, the Court again reviewed prosecutorial misconduct as a violation of due process in *Giglio v. U.S.*, stating, "that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" 405 U.S. 150, 153 (1972). This deception is not limited to false testimony. The *Giglio* Court also called for a new trial when the testimony withheld would have affected the outcome of the trial **or** affected the credibility given to the witness. "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule." *Giglio v. U.S.*, 405 U.S. 150, 154 (1972), citing *Napue v. People of State of Ill.*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). It follows logically that a court's determination of a particular witness' credibility may be undermined by the actions or inactions of the prosecutor. Thus, *Giglio* held prosecutors owed a duty to disclose impeachment evidence affecting the credibility of a state witness, in accordance with *Brady*. *See generally Giglio*, *supra*.

"A fair analysis of the holding in *Brady* indicates that implicit in the requirement of materiality is a concern that the suppressed evidence **might have** affected the outcome of the trial." *United States v. Agurs*, 427 U.S. 97, 104, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342 (1976)

*holding modified by United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481

(1985) (emphasis added).

Most recently, the U.S. Supreme Court summarized its holdings stemming from *Brady* in

*Youngblood v. W. Virginia*:

> A *Brady* violation occurs when the government fails to disclose
> evidence materially favorable to the accused. See 373 U.S., at 87,
> 83 S.Ct. 1194. This Court has held that the *Brady* duty extends to
> impeachment evidence as well as exculpatory evidence, *United
> States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d
> 481 (1985), and *Brady* suppression occurs when the government
> fails to turn over even evidence that is "known only to police
> investigators and not to the prosecutor," *Kyles,* 514 U.S., at 438,
> 115 S.Ct. 1555. See *id.,* at 437, 115 S.Ct. 1555 ("[T]he individual
> prosecutor has a duty to learn of any favorable evidence known to
> the others acting on the government's behalf in the case, including
> the police"). "Such evidence is material 'if there is a reasonable
> probability that, had the evidence been disclosed to the defense, the
> result of the proceeding would have been different,' " *Strickler v.
> Greene,* 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286
> (1999) (quoting *Bagley, supra,* at 682, 105 S.Ct. 3375 (opinion of
> Blackmun, J.)), although a "showing of materiality does not
> require demonstration by a preponderance that disclosure of the
> suppressed evidence would have resulted ultimately in the
> defendant's acquittal," *Kyles,* 514 U.S., at 434, 115 S.Ct. 1555.
> **The reversal of a conviction is required upon a "showing that
> the favorable evidence could reasonably be taken to put the
> whole case in such a different light as to undermine confidence
> in the verdict."** *Id.,* at 435, 115 S.Ct. 1555.

547 U.S. 867, 869-70, 126 S.Ct. 2188, 2190, 165 L.Ed.2d 269 (2006). Through *Brady* and its

progeny, the U.S. Supreme Court unambiguously interpreted clearly established federal law: the

right to due process of law. Prosecutorial misconduct, as viewed by the U.S. Supreme Court, can

and clearly has in the past affected, deprived and/or denied criminal defendants the right to due

process and consequently the right to a fair trial. "[T]o reiterate a critical point, the prosecutor

will not have violated his constitutional duty of disclosure unless his omission is of sufficient

significance to result in the denial of the defendant's right to a fair trial." *U.S. v. Agurs*, 427 U.S. 97, 108 (1976) *holding modified by U.S. v. Bagley*, 473 U.S. 667 (1985).

> Thus the term "*Brady* violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence— that is, to any suppression of so-called "*Brady* material"— although, strictly speaking, there is never a real "*Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Thus, the burden placed on the defendant to meet the materiality element of a *Brady* violation requires prejudice by the violation such that the resulting verdict cannot stand. See *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995) (emphasis added). The reversal of a conviction is required upon such a showing. *Youngblood v. W. Virginia*, 547 U.S. 867, 870, 126 S.Ct. 2188, 2190, 165 L.Ed.2d 269 (2006).

### Facts in Support of Grounds for Relief

The prosecution's failure to disclose a pending criminal investigation into a material witness for the State violated *Brady* and its progeny.

Throughout Dallas Staden's investigation, prosecution and trial, Thanh Nguyen, a/k/a "Money," was under investigation by the Drug Enforcement Agency for a conspiracy to distribute a controlled dangerous substance and for its possession, manufacture and distribution. This investigation ultimately resulted in his federal conviction of Possessing a Controlled Substance with the Intent to Sell, Distribute or Dispense the same in 2013, for which he was sentenced to imprisonment of 27 months, supervised release of 2 years, to pay an assessment in the amount of $100.00 and to pay a fine in the amount of $1,000.00. *See United States of*

*America v. Son Nguyen, et al.*, U.S. District Court for the Middle District of Louisiana criminal case docket no. 3:12-cr-00085-BAJ-RLB. At no point during the investigation, prosecution or trial of Mr. Staden was the pending criminal investigation into Thanh Nguyen disclosed.

At trial, Mr. Staden testified as to a drug buy gone wrong. R 732. He reiterated this point in closing. R. 792. Had the trial court had an opportunity to consider the investigation of Nguyen, a/k/a Money, in its determination of his credibility and veracity, Mr. Staden's defense theory might have had more weight by the time he closed his case.

"When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within" the general rule of *Brady*, *U.S. v. Giglio*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). The reliability of Thanh Nguyen very well may have been determinative of Mr. Staden's guilt or innocence. The prosecution's bad faith withholding of this pertinent impeachment evidence deprived the trial court of the opportunity to fairly and fully assign credibility and weight to the testimony of Thanh Nguyen. The reviewing courts, in appeal and post-conviction, failed to correct this grave error, thus unreasonably applying the clearly established federal law of *Brady* and its progeny.

<u>The prosecution's failure to correct false testimony by its material witness at trial further contributed to the prosecutorial misconduct at hand.</u>

Thanh Nguyen testified that after the robbers fled, he grabbed the store's gun from behind the counter, ran outside and fired. The gun jammed, so he came back inside Alby's, reloaded and ran back outside, where he, again, discharged the gun twice. R. 600. According to Nguyen, Mr. Staden followed him outside the second time and then, contrary to the testimony of the State's other witnesses, fled in a red Mazda. R. 600, 601, 602, 604, 607.

On cross-examination, Mr. Staden was able to undermine the confidence of Nguyen's testimony:

> Q.    You – You saw me get in the red car?
> A.    Yes.
> Q.    Are you sure about that?
> A.    Yes.

R. 607. Nguyen then testified that he witnessed the defendant get out of *and* leave in the red Mazda.

> A.    Why don't we show the video you came out the car with your brother?
> Q.    I came out of the car with my brother?
> A.    Yeah.
> Q.    You seen it with your own two eyes – [sic]
> A.    Yeah.
> Q.    – too?
> A.    Yeah. It's on the video.

R. 608. Mr. Staden then asked, "Are you as sure about that as you are about me getting in the…red Mazda?" *Ibid.* The witness agreed he was just as sure about Mr. Staden arriving in the red car as he was about him leaving in the red car. At that time, the defense played the Shop Smart video.[3] After watching the video, Nguyen's testimony could not remain consistent. He even confused himself on stand. R. 609-10.

> Q.    Didn't you just say I got out of the red car?
> A.    No. I said you jumped in the red car.
> Q.    It was your – your testimony that you saw me get into the
>        red car and that you saw me get out of the red car?
> A.    I said after the –
> Q.    Let – Let me finish. It was your testimony that you seen me
>        get in [sic] – in the red car and got out of the red car, the
>        red Mazda; is that correct? Yes or no?
> A.    Not in, but out – no, not out, but in.
> Q.    Which is it? Did you see me get in the red car or out?

---

[3] Note that the Shop Smart video, the State's key piece of photographic evidence of the events of December 1, 2009, was security footage recorded by a camera owned and installed by the 19th Judicial District Attorney's Office for the Parish of East Baton Rouge. *See* R. 448-451 (in which the custodian of the footage testified, "It was put in through Hillar Moore with the D.A.'s Office… I don't know if you want me to go into the specifics of why, but…it was put in for them."). *See also* R. 420.

> A.    No. You – you got out of the white Expedition… Explorer,
> whatever you want to call it, on the side of the store.

R. 609-10. As Mr. Staden attempted to impeach him, standby counsel requested the court reporter reread the recent transcription, specifically demonstrating the witness testified adamantly and falsely to Mr. Staden' arriving with the gunmen and perpetrators of the armed robbery. The facts as presented by the State's other witnesses do not agree with Nguyen's falsified and ultimately muddled testimony. R. 672 (Det. Higginbotham testified that Nguyen never mentioned the defendant fleeing in the red car to him during his investigation), 546 (Sam Tran testified that the defendant came over and untied him *after* Nguyen fired the gun twice outside at the fleeing perpetrators) and 547 (Tran never saw which way the defendant left).

Even the State and standby counsel were confused by the witness' testimony, ultimately agreeing that neither of them understood what the witness stated and urged the court reporter to read back his testimony. R. 611. **The trial court, however, refused to hear the testimony read back by the court reporter.** R. 612. The State, having an obligation of veracity and candor to the court, should have stepped in and corrected the false testimony once the court refused to entertain the rereading of the record by the court reporter. Instead, the record reflects the State, on redirect, tried to confirm Nguyen's confusing testimony in a light most favorable to the prosecution:

> Q.    Mr. Nguyen, the – Sherwood Forest, how many lanes is
> that?
> A.    They got two on each lane going up and going down.
> Q.    Okay. So it's two going north, two going south?
> A.    Two going south, yes, sir.
> Q.    Okay. Now, um, when was the first time that day that you
> actually saw with your own eyes – you saw Dallas Staden
> with your own eyes that day?
> A.    With my own eyes? When he came in the store and talked
> to Sam.
> Q.    Okay. That's the first time you saw him?

A.    First time.

Q.    Okay. When was the last time you saw him?

A.    When he jumped in the red car.

Q.    Okay. When he jumped in that red car, how many people did you think were in the car at that time?

A.    At that time, before he jumped in that?

Q.    No. No. After he jumps in the car and they – they drive – drove away, correct?

A.    Yeah.

Q.    How many people –

A.    Three, –

Q.    You –

A.    -- Because I saw two in and he jumped in the back. So I figured it was only three because I never really – I only saw two people walk in the store in – the first time.

Q.    Well, this is what I want to as – this is what I want you to focus on, though. I know a lot was happening; but, talking about your own eyes, what did you actually see in the vehicle? Like how many people – before he jumped in the car, okay, how many people did you see with your own eyes?

A.    Two.

Q.    Okay. You saw two people with your own eyes. After he jumped in the car and they drove away, how many people were in it?

A.    Three.

Q.    Okay. How many people when – how many people did you think were involved in the robbery when you were – when – after – after you had fired the weapon and you called the – you were on the phone with – with the 911? How many people did you think was involved in the robbery?

A.    I thought it was – uh – four 'cause I – but I really – at first I thought it was two. Then I heard the lady in the back scream so that's three. And they got to have another driver, **but then I didn't really see** – see that last dude form the back so I really didn't know what was doing or I didn't know if they was having a driver of the – in the car.

R. 631-634. The State continued to question Nguyen, locking in his false testimony, despite the blatant speculation from the witness stand. His testimony as to the number of people participating in the armed robbery was inconsistent. R. 632. His testimony as to when was the first time he saw Dallas Staden was, likewise, inconsistent. R. 608, 631. Most importantly,

Nguyen's testimony about whether or not Dallas Staden participated was inconsistent; after adamantly testifying to Mr. Staden's alleged active role in the robbery,

Instead of upholding the integrity of the justice system, the Assistant District Attorney undermined it by not only allowing but also encouraging Nguyen's false testimony. Thanh Nguyen's testimony is so inconsistent and unclear because he had something to hide: his part in the events of the morning of December 1, 2009. The pending investigation of Nguyen, the testimony of Mr. Staden and the sworn statement of Bianca Frank, *infra*, independently corroborate the defense theory of a chaotic drug deal, motivation for Nguyen to fabricate his version of events. The Assistant District Attorney's failure to Nguyen's clearly false testimony, after failing to disclose his pending investigation to the defense, contributed to the overarching prosecutorial misconduct in this case and prejudiced Mr. Staden's trial so greatly, it resulted in the petitioner's conviction. The prejudice is apparent: the testimony of Thanh Nguyen is exactly what the trial court cited in its oral reasons for ruling. R. 798-801.

The prosecutor's bad faith interference with the presentation of defense witnesses known to have both favorable and material testimony to offer on the defendant's behalf directly deprived him of the right to a fair trial by the denial of due process.

Four lay witnesses Mr. Staden intended to testify appeared at trial on November 9 and 10, 2010, and three were turned away.[4] Consistently, their post-trial letters to the trial court, Judge Anthony Marabella, Jr., indicate that at least on one occasion, Assistant District Attorney Jeff Traylor refused a witness' entry at trial, consequently denying the defendant of the opportunity to present mitigating and potentially exculpatory evidence on his behalf.

Unbeknownst to Mr. Staden, multiple witnesses appeared to testify as to what they knew, respectively, of the events leading up to his arrest. However, the assistant district attorney not only failed to investigate exculpatory information provided by these witnesses but further

---

[4] See Exhibits 1-4.

prevented them from testifying, ultimately interfering, in bad faith, with defense witnesses, unbeknownst to the defendant. The testimony these witnesses would have presented at trial would have been both favorable and material for the defense.

Ms. Akedra Brown, in an August 8, 2013 letter sent to Judge Marabella, stated she overheard the armed robbery being planned on the morning of December 1, 2009. Exhibit 1, page 1. Ms. Brown knew Mr. Staden was not involved in planning the robbery, because she saw the perpetrators planning and he was not present. Exhibit 1, page 1. She contacted a detective who informed her he had already turned his investigation over to the District Attorney's Office, so she then contacted the Assistant District Attorney assigned to the case, Mr. Traylor. Exhibit 1, page 2. She relayed to him what she overheard and witnessed; he asked her who she had already spoken to about her observations and then told her he would call her back. Exhibit 1, page 2. He never called her back. She wrote, "I call [sic] him so many times and left messages that I just got it." Exhibit 1, page 2. Finally, she learned of the trial date and time from the defense investigator. She appeared and was turned away by Mr. Moore, the defendant's standby counsel. Exhibit 1, page 2-3. Nonetheless, she reappeared the next day to testify at trial and it was at this moment that she was turned away by Mr. Traylor. Exhibit 1, page 3. She wrote:

> I went the next day but a cop told me the trial had move [sic] to a few hours later. He went in the courtroom and told me to wait. A guy came out and asked my name and told me he was a prosecutor. He said he been [sic] meaning to get in touch with me. He ask [sic] for me to tell him what happen [sic] again so I told him. He asked if I talked to Dallas' lawyer. I told him yeah and that he told me that he would call me if he needed me. **The prosecutor tried not to laugh. He told me if they don't need you then I don't need you [sic]. I asked if I could go in and he said it was against the law and I could leave or wait until the trial was over. I left.**

Exhibit 1, page 3 (emphasis added). Perhaps most importantly, Ms. Brown wrote:

> I just felt so bad because I know he didn't do that he was not even
> one of the people I saw planning the robbery. [sic] They didn't
> even want to tell him – I know all that because one person wanted
> to and all the others was like don't, keep in him in the blind he
> might tell the police [sic].

Exhibit 1, page 3. A material witness, who not only proactively tried to contact law enforcement but also repeatedly attempted to contact the assistant district attorney responsible for Dallas Staden's prosecution, was intentionally prevented from testifying at trial with clearly exculpatory information. Mr. Traylor misadvised Ms. Brown that to even **enter** the courtroom would be breaking the law. No federal law supports this. In fact, the U.S. Supreme Court has found there is a constitutionally protected right of the public to attend criminal trials. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 581, 100 S.Ct. 2814, 2829-30, 65 L.Ed.2d 973 (1980) (holding that "[a]bsent an overriding interest articulated in findings, the trial of a criminal case must be open to the public," making access to criminal trials "a guaranteed right of the public under the First and Fourteenth Amendments"). Therefore, the only conclusion that can be deduced from the Assistant District Attorney's words and actions is **bad faith**.

The Assistant District Attorney's bad faith can be further inferred from the transcript of November 8, 2010. R. 417-19. Standby counsel and the trial court discussed witnesses Mr. Staden needed in order to hear *motions in limine* he intended to file prior to trial. When the trial court inquired of Mr. Moore whether he had any control over their appearance, Mr. Traylor interrupted:

| | |
|---|---|
| The Court: | Do you have any control over those witnesses that he – |
| Mr. Traylor: | Yes, your honor. **I** have set them to be here at 9:00 o'clock tomorrow morning. I – |
| The Court: | Okay. |
| Mr. Traylor: | I apologize. |

R. 418-19 (emphasis added). The prosecution had no business contacting and effectively **interfering with** defense witnesses.

This aggregate bad faith interference with the presentation of defense witnesses, in addition to violating *Brady* and its progeny, clearly deprived Mr. Staden of the right to present his own witnesses, the right to present his own defense, due process of law and the right to a fair trial. Mr. Staden, inside the courtroom and not free to move of his own volition due to his continued pretrial detention by the State, had no knowledge that Ms. Brown appeared to testify on his behalf, nor did he have the ability to either call her for testimony or dismiss her. The resulting prejudice is clear.

## Unreasonable Application of Clearly Established Federal Law

"Whether documents must be produced and whether they are material under *Brady* is a mixed question of law and fact." *Trevino v. Johnson*, 168 F.3d 173, 184 (5th Cir.1999), citing *Brown v. Cain,* 104 F.3d 744, 750 (5th Cir.), *cert. denied,* 520 U.S. 1195, 117 S.Ct. 1489, 137 L.Ed.2d 699 (1997); *Kennedy,* 54 F.3d at 682. This is a mixed question of law and fact, thus §2254(d)(1) applies.

As detailed above, the law requires three elements be met in determining a *Brady* violation: (1) the evidence is favorable to the accused, either because it is exculpatory or impeaching; (2) that evidence was suppressed by the State; and (3) prejudice resulted. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). In each identifiable and articulable instance of prosecutorial misconduct that occurred in Mr. Staden's prosecution, these elements **are** met. The bottom line of *Brady* and its progeny is: the State **must** disclose all exculpatory and impeachment evidence to the defendant and its failure to do so is reversible error.

First, when the State failed to disclose the criminal investigation of its key witness, Thanh Nguyen, it violated the *Brady* line of cases. This evidence is favorable as this disclosure was relevant for the finder of fact's credibility determination of Nguyen's character and testimony. The State's failure to disclose the same amounted to suppression. The trial court could not have made a fair determination of the credibility of the witness without a full disclosure of impeachment evidence, namely the pending criminal investigation. The weight the trial court gave to Nguyen's testimony might have been different had it known of the pending narcotics investigation into him. Mr. Staden's own closing argument presented the theory of a drug buy gone wrong (R. 792); this argument, combined with the knowledge of the investigation, might have affected how the trial court received and judged the testimony of Thanh Nguyen. The reviewing courts, in failing to adjudicate this matter on its merits, unreasonably applied clearly established federal law as interpreted by the U.S. Supreme Court. A reasonable application of the same would have warranted an evidentiary hearing to determine whether Mr. Nguyen was in fact under investigation at the time he gave testimony against Dallas Staden for the State of Louisiana. After all, impeachment evidence, when used effectively, may make the difference between conviction and acquittal. *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985).

Next, the State's failure to correct Thanh Nguyen's testimony, known to be false, violated the *Brady* line of cases. The State owed a duty to the court, to the public and to the defendant to protect the integrity of the criminal proceedings; candor to the court, especially from the State's own witness, was critical to preserving the tribunal's impartiality. The trial court thwarted the attempted impeachment of Nguyen, effectively failing to apply clearly established federal law to the facts of Mr. Staden's case. Because the impeachment was prevented and the State failed to

correct the knowingly false testimony, Mr. Staden was prejudiced. The reviewing courts, in failing to adjudicate this matter on its merits, unreasonably applied the law, as required by the U.S. Supreme Court. As the Court stated in *Napue, supra,* "it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend," at 269.

Finally, the prosecution's interference with the presentation of potentially favorable and exculpatory witness testimony from Akedra Brown clearly violated *Brady*. The prosecutor has a duty to investigate and the knowledge of law enforcement is imputed to the prosecutor in a criminal case. Akedra Brown contacted the prosecutor **numerous** times and he consistently failed to return her calls and investigate her claims. In fact, he turned her away from testifying and wrongly informed her that entering a public trial would be illegal. The reviewing courts, in refusing to adjudicate this matter on its merits, failed to apply clearly established federal law as consistently interpreted by the United States Supreme Court. The *Brady* violations and resulting conviction stand in spite of the defendant's constitutional rights.

## III. DENIAL OF 6TH AMENDMENT RIGHTS

### Federal Law on Sixth Amendment Guarantees

The Sixth Amendment guarantees a criminal defendant the right to assistance of counsel in his defense. U.S. Const. amend. VI. It further entitles the defendant to be present at every stage of trial and its guarantees extend to the same. *Snyder v. Com. of Mass.*, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934). The United States Supreme Court, in *Faretta v. California*, interpreted the Sixth Amendment to implicitly guarantee a defendant the right to self-representation, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

> The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the

> right to make his defense. It is the accused, not counsel, who must be 'informed of the nature and cause of the accusation,' who must be 'confronted with the witnesses against him,' and who must be accorded 'compulsory process for obtaining witnesses in his favor.' **Although not stated in the Amendment in so many words, the right to self-representation—to make one's own defense personally—is thus necessarily implied by the structure of the Amendment. The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails.**

*Id.* at 819-20 (emphasis added).

> The language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant—not an organ of the State interposed between an unwilling defendant and his right to defend himself personally. **To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment.** In such a case, counsel is not an assistant, but a master; and the right to make a defense is stripped of the personal character upon which the Amendment insists.

*Id.* at 820 (emphasis added). In short, a court cannot impose upon the defendant the assistance of counsel when the defendant clearly expresses his desire to proceed *in prope persona*. However, the Court further ruled that a trial court may appoint "standby counsel" to aid in the *pro se* defendant's defense. The 5th Circuit Court of Appeals has held that a criminal defendant can either represent himself or have counsel, but he has "no right to hybrid representation." *Lee v. State of Ala.*, 406 F.2d 466, 469 (5th Cir.1968). The U.S. Supreme Court then expanded its *Faretta* holding in *McKaskle v. Wiggins* just a few years later, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984), wherein the defendant urged his Sixth Amendment right to self-representation was impaired "by the distracting, intrusive, and **unsolicited participation of counsel** throughout the trial." *Id.* at 176 (emphasis added). The Court found the *Faretta* right required limitations.

> If standby counsel's participation over the defendant's objection effectively allows counsel to make or substantially interfere with any significant tactical decisions, or to control the questioning of witnesses, or to speak instead of the defendant on any matter of importance, the *Faretta* right is eroded.

*McKaskle v. Wiggins*, 465 U.S. 168, 178, 104 S.Ct. 944, 951, 79 L.Ed.2d 122 (1984). Relying on the standard of reasonableness of standby counsel's interference with trial, the Court ultimately held:

> We recognize that a *pro se* defendant may wish to dance a solo, not a *pas de deux*. Standby counsel must generally respect that preference. But counsel need not be excluded altogether, especially when the participation is outside the presence of the jury or is with the defendant's express or tacit consent.

*McKaskle v. Wiggins*, 465 U.S. 168, 187-88, 104 S.Ct. 944, 956, 79 L.Ed.2d 122 (1984). Thus, *Faretta* addressed whether a defendant is entitled to represent himself; *McKaskle*, addressed the limits of standby counsel appointed to advise the *pro se* defendant. The United States Supreme Court purposefully applied limits to standby counsel's participation in and representation of the defendant, because standby counsel **is not** trial counsel for the purposes of the *pro se* defendant.

## Facts in Support of Grounds for Relief

The Trial Court's appointment of standby counsel was defective due to the nature of the position of "standby" or advisory counsel.

Respectfully, the position of standby counsel is fundamentally defective. A competent and otherwise effective attorney would not be able to provide effective representation to a criminal defendant while his hands are tied and his mouth taped shut. *Faretta* forbids a court from forcing a defendant who has competently waived his right to counsel to accept representation but enables an attorney to advise a *pro se* defendant as to procedures of court, rules of evidence and defense tactics; *McKaskle* limits the active participation of standby counsel

at trial, specifically to respect the defendant's wishes and to curb standby counsel's undue interjection into and interference with the defendant's trial.

The foregoing federal jurisprudence indicates that standby counsel's involvement in trial, whether it is conducting *voir dire* on a potential juror or cross-examining a state witness, is limited only to the defendant's wishes. Where standby counsel and the defendant disagree, the defendant's will should **always** prevail over his standby counsel's advise or course of action, as he is representing himself.

Because standby counsel's role is so limited, he cannot provide representation to the defendant at all, let alone **effective** representation. Should he overstep the defendant's wishes by interjecting himself into the proceedings, he ultimately prejudices the defendant's case by taking over control of the trial. Perhaps Justice White, in his extensive *McKaskle* dissent, explained best exactly how standby counsel is inherently ineffective:

> The Court reaches a different conclusion by pinning the blame for the interference with the right to proceed *pro se* on Wiggins himself and by dissecting counsel's activities into discrete categories and **failing to consider their overall impact**. These tactics, of course, both required the Court to do its own factfinding [sic], a function normally left for district courts. Neither approach can withstand scrutiny. Particularly when the trial court has expressly refused to order standby counsel to serve in a purely advisory capacity, a *pro se* defendant cannot reasonably be expected to object to counsel's every action. Not only would the trial court's initial decision tend to impress upon the defendant the futility of continuing objections, but also repeated objections could destroy the impression the defendant seeks to convey to the jury. Accordingly, **a defendant's acquiescence in a violation of his *Faretta* right should not immunize that violation from judicial review. Similarly, the fact that a *pro se* defendant, with the trial court's approval, has authorized standby counsel to perform a discrete representational function <u>should not</u> give rise to a presumption that the defendant also has sanctioned subsequent interference in the conduct of the trial.** In any event, the most glaring intrusions by counsel occurred without Wiggins' blessing.

*McKaskle v. Wiggins*, 465 U.S. 168, 196-97, 104 S.Ct. 944, 960, 79 L.Ed.2d 122 (1984) (emphasis added). The imposition of standby counsel onto an unwilling defendant almost beseeches the usurpation of that defendant's inalienable right to represent himself, craft his own defense and control every aspect of its presentation at trial.

When the court insists upon imposing standby counsel to aid in the *pro se* litigant's defense, it cannot impose hybrid representation. Either the standby counsel is advisory or he is the attorney representing the defendant. If he is advisory only, he cannot possibly render effective assistance of counsel to the defendant. If he is forced upon the defendant as his advocate, then the *pro se* litigant is deprived of his Sixth Amendment right to self-representation as delineated in *Faretta*.

<u>Standby counsel's unpreparedness rendered him ineffective.</u>

On October 6, 2010, the trial court appointed Mr. Steven Moore to act as standby counsel in Mr. Staden's case. *See* R. 135-36, 398, 408. Trial was scheduled for November 8, 2010.[5] Mr. Moore had no discovery, no knowledge of Mr. Staden's case and little knowledge of the allegations against him. He accepted the appointment as advisory counsel yet failed to prepare for trial. Mr. Moore had an opportunity, albeit brief – one month, to become familiar with Mr. Staden's case, defense theory and the presentation thereof, yet failed to do so. Even the trial court recognized, at the outset of trial, Mr. Moore's unpreparedness to proceed, stating, "Mr. Moore is standby counsel. The Court recognizes that Mr. Moore has not had a large opportunity to learn very much about the case. He was only appointed recently as standby attorney." R. 435.

Mr. Moore himself acknowledged in his October 21, 2010 letter to Dallas Staden that he was unprepared for trial and would not be handling any aspect of the case, stating:

---

[5] Mr. Staden and Mr. Moore appeared in court for trial on November 8, 2010, but the trial court continued the matter to November 9, 2010; a bench trial was conducted before Honorable Judge Anthony Marabella on November 9 and 10, 2010. R. 408-09.

> As you are well aware, the court has asked me to be your stand by [sic] counsel in your upcoming trial before the Honorable Judge Tony Marabella. As we discussed when we met in court, all of our conversations are under the attorney-client privilege and **it is my understanding that you are handling all aspects of this case. The Court informed you that at this point I will not be handling any witnesses nor doing any investigative work on your behalf.**

R. 233 (emphasis added). In effect, Mr. Moore recognized his unpreparedness for trial and gave Mr. Staden notice of his intent **not** to prepare for trial, even though the purpose of standby counsel is to be prepared to take over trial at the defendant's request, at any point prior to or during trial. His indication that **the court** informed Mr. Staden that standby counsel would not handle any witnesses was not only misleading but outright false.

After appointing Mr. Moore, the trial court inquired into potential defense witnesses. Mr. Staden indicated he had numerous witnesses he intended to subpoena. R. 409-10. The court interrupted Mr. Staden, urging him to give his list of witnesses to Mr. Moore, his standby counsel. R. 410. Mr. Staden promptly gave his witness list to Mr. Moore. R. 410-11. Some of the lay witnesses on Mr. Staden's list were never subpoenaed, despite the Court's instruction for Mr. Staden to turn over the witness list to his standby counsel for the purpose of subpoenaing defense witnesses. Mr. Staden turned over the list to Mr. Moore. However, one day before trial, Mr. Moore did not have the list Mr. Staden gave him; rather, he relied on Mr. Staden's "file" to craft a witness list for the next morning. R. 421 ("Mr. Staden: 'I don't have my list.' Mr. Moore: 'I wrote a list just looking at your file.'"). Nonetheless, the witnesses Mr. Staden wanted subpoenaed never testified at trial. In his December 21, 2010 letter to the East Baton Rouge Parish Clerk of Court, Mr. Staden inquired about the subpoena returns and asked the Clerk provide him copies of receipts of service. R. 193. He wrote, "I don't know who did or didn't show up or why they weren't allowed in the court or if they ever got their court orders." R. 193.

Standby counsel, as an advisor alone, should **not** be responsible for filing subpoenas. Nonetheless, the trial court in this case placed the burden of subpoenaing those witnesses on Mr. Moore. R. 410. His failure to subpoena Mr. Staden's witnesses rendered him ineffective as not only did this contribute to his intentional unpreparedness (as memorialized in his letter to Mr. Staden, sent two weeks after being tasked by the trial court with subpoenaing all defense witnesses) but also seriously impaired Mr. Staden's presentation of defense. *See* R. 233.

The lay witnesses Mr. Staden attempted to subpoena for trial would have negated the testimony of Thanh Nguyen. Specifically, such testimony would have demonstrated Mr. Staden never arrived at or left Alby's in a red car, that Mr. Staden **remained** at Alby's after Jeffrey Staden and his confederates fled and that the testimony elicited by the Assistant District Attorney from Thanh Nguyen at trial was not only contradictory within itself but mendacious. *See* Bianca K. Frank's notarized statement sent to the trial court as a letter following Mr. Staden's conviction, attached as Exhibit 3.

Had Mr. Staden had the opportunity to compel these defense witnesses to testify on his behalf at trial, this would not be an issue. Mr. Staden **did** have the opportunity to subpoena his own witnesses when he was still in control of his own defense but lost that opportunity when the trial court instructed him to hand his witness list, and thus his power to compel his own witnesses to testify on his behalf, over to standby counsel. R. 410. Arguably, this act deprived Mr. Staden of his autonomy in self-representation. Due to standby counsel's failure to subpoena the defense witnesses, Mr. Staden was denied his right to compulsory process. This denial, an ultimate Sixth Amendment violation, was the direct result of the trial court's late appointment of standby counsel, the ambiguity of standby counsel's role and standby counsel's failure to subpoena Mr.

Staden's witnesses after the trial court handed power to subpoena over from the defendant to ineffective standby counsel.

<u>Standby counsel's dismissal of defense witnesses, without the defendant's knowledge or consent, contributed to his ineffective assistance of counsel and further denied the defendant the right to present his own defense.</u>

Mr. Moore dismissed three lay witnesses who appeared voluntarily to testify on Mr. Staden's behalf at trial. Not only did Mr. Moore fail to subpoena these witnesses, as requested by Petitioner, but he thereafter instructed them to leave the courthouse rather than alerting Mr. Staden of their presence. The trial court recognized, during trial, that Mr. Staden had **no control** over the appearance of his witnesses. R. 675 ("Mr. Staden, I know you don't have any control over who comes or who doesn't come; but, uh, I will expect you to have all your witnesses here tomorrow, ready to go."). Even Mr. Staden, in his closing argument, recognized he was missing witnesses he hoped to call. R. 793 ("I would have had more witnesses…").

Four letters addressed to the trial court following Mr. Staden's conviction and sentencing lodged similar complaints about being prevented from testifying on his behalf. Exhibits 1, 2, 3, 4. Each complainant, alarmingly, identified the same gatekeeper who turned her away: Mr. Staden's standby counsel, Mr. Steven Moore. This action denied Mr. Staden a fair trial as he was denied the opportunities to present potentially favorable testimony, to impeach testimony of the State's witnesses and to control every aspect of his defense.

In her sworn and signed letter sent to the court, Ms. Bianca K. Frank wrote that she observed, firsthand, the aftermath of the December 1, 2009 armed robbery. Exhibit 3. Supportive of Mr. Staden's defense theory as presented in his closing argument, Ms. Frank, who could not have known the content of Mr. Staden's closing due to being denied entry to the courtroom during his trial, claimed to have witnessed the following:

> As I stepped out of my car to go inside Alby's I witnessed an Asian guy run out of the store and shoot at a red car. I ran back to my car. Seconds later, I see the Asian guy and a black guy come out of Alby's together. I stepped out of my car and asked were they okay. The Asian guy was hysterical. He began asking the black guy if he knew the robbers. He asked the black guy to phone them and gave him his phone to do so. The Asian guy ran back into the store and came back yelling, **"Just tell him to bring back my dope. He can keep the money."**

Exhibit 3 (emphasis added). Mr. Staden proposed this was the result of a drug deal gone wrong. R.732, 792. This defense was never fully developed as a result of Mr. Staden's witnesses' dismissal.

Defense witness Talicia Cavalier independently corroborated Ms. Frank's letter with a letter of her own, dated August 7, 2013. Exhibit 2. She wrote, in pertinent part:

> I told Mr. Moore that a Bianca Frank was calling asking when was she supposed to come to the trial. He joked that I should tell her to stay far away from the building. **He then said I should tell Dallas to not call of** [sic] **the witnesses because Judge Marabella would get angry.** I then asked him again about what I should tell the lady. He said he was about to call her immediately. Bianca told me he never called her. I asked him was Dallas going to come home. He said he was and he said he believe [sic] that Dallas was innocent but it was up to Judge Marabella. **He also said that Judge Marabella didn't like Dallas too much.**

Exhibit 2 (emphasis added). The letters sent to the trial court agree that Mr. Moore actively turned witnesses away and failed to investigate the claims of witnesses wanting to assist Dallas Staden in his defense. The content of these letters also aligns, demonstrating Mr. Moore indicated that the trial judge did not like Mr. Staden and that Mr. Staden did not know what he was doing, resulting in Mr. Moore's appointment as standby counsel.

Defense witness, Jayda Staden, in her September 4, 2013 letter to the trial court, indicated her dismissal after being taken into custody midtrial and then released to be sequestered outside the courtroom. Exhibit 4. The trial court **did** in fact seize and detain Ms. Staden after her outburst

during Thanh Nguyen's testimony, in which he threatened to kill Dallas Staden. R. 618-20. Ms. Staden wrote:

> I went back in front of the judge and he told me he was letting me go so that I could testify for my brother. He asked me to wait outside the courtroom. Later that hour, Dallas's [sic] lawyer Steve came outside and told me he had spoke [sic] with the judge and didn't want me to testify. I asked to speak with Dallas about it. **He said that Dallas didn't know what he was doing and that's why the judge asked him to help him.** He asked me to bring the lease to my apartment and he would handle the rest. **He told me I didn't need to come back and I didn't.**

Exhibit 4 (emphasis added). Ms. Staden was specifically sequestered so that she **could** testify for her brother but his standby counsel took it upon himself to relieve her of testifying. She, like the others who appeared to testify on Mr. Staden's behalf, was dismissed by Steve Moore.

Thus, standby counsel's erroneous dismissal of these defense witnesses denied the defendant the right to present a defense, the right to conduct his own defense and the right to present witnesses in his defense. Such direct interference with Mr. Staden's defense resulted in a violation of his Sixth Amendment rights.

Standby counsel's participation in and involvement with Mr. Staden's case violated his Sixth Amendment rights as articulated in *Faretta* and *McKaskle*.

The critical distinction between *McKaskle* and Mr. Staden's case is the mode of trial. The *McKaskle* defendant represented himself with standby counsel at a jury trial; Mr. Staden represented himself with standby counsel at a bench trial. *McKaskle* limits standby counsel's role and active participation at trial to only what is reasonable. The "reasonableness" of standby counsel's interference in Mr. Staden's case must be evaluated in light of the entirely different modes of trial employed in his case and in *McKaskle*. Mr. Staden waived his right to a trial by jury, with the hope that the court would be more receptive to his presentation of defense than a jury would be.

In finding that standby counsel's minimal involvement with and participation in the presentation of defense did not prejudice the *McKaskle* defendant's case, it seems the U.S. Supreme Court implicitly suggested there may be an instance in which standby counsel's involvement with and participation in the presentation of defense not only deprives the defendant of his *Faretta* right but actually prejudices the defendant's case in such an irreversible way that the fundamental miscarriage of justice would result. The concern in *McKaskle* was that the jury would observe the defendant and his standby counsel, who was appointed over his objection by the trial court, disagree and the defendant would lose autonomy as his own advocate, effectively depriving him of his *Faretta* right to self-representation.

No such concern existed in Mr. Staden's case, because there was no jury to prejudice. The trial court, as a learned and greatly experienced trier of fact, should have understood the implications of any disagreements between the defendant and standby counsel and anticipated resolving them in the defendant's favor, as he was the master of his own defense. Where the defendant chose to prepare his own defense, confront his accusers and firmly represent himself at every stage of trial, any conflict between him and the court-appointed standby counsel should have been resolved in the defendant's favor. This was **not** the case for Mr. Staden.

Nonetheless, Mr. Moore examined and cross-examined witnesses, morphing his representation of Mr. Staden into the expressly forbidden "hybrid counsel." He questioned State's witness Sam Tran about the gun used by Thanh Nguyen to chase the aggressors out of Alby's. R. 549. Innocuous as this one event may seem, his continued interjections at trial amounted to an egregious violation of Mr. Staden's Sixth Amendment rights.

Mr. Moore's subsequent interjection into the examination and cross-examination of State witness, Thanh Nguyen, resulted in hostility from the witness, muddled testimony and the trial

court refusing to entertain Mr. Staden's attempted impeachment of Thanh Nguyen. R 608, 610. When Mr. Staden successfully caught Thanh Nguyen's contradicting testimony, the trial court refused to allow the court reporter to reread the blatantly conflicting testimony. R 609, 618, 612.

Mr. Moore intervened when Nguyen testified about removing the bag from Sam Tran's head. R. 604. However, his undue involvement in the defendant's cross-examination of Thanh Nguyen is what really frustrated the proceedings and resulted in a hostile witness; Mr. Moore's actions prejudiced Mr. Staden's defense. Mr. Moore intervened, to clarify the red car testimony of Nguyen:

> By Mr. Moore:
> Q.     This car just pulled out in the middle of the street, did it not?
> A.     Yeah.
> Q.     And there's a car that came flying up behind it?
> A.     It didn't stop.
> Q.     Right. So how did he have time to get inside that red car –
> A.     Didn't – Didn't you hear what I said? He got on the other side of the street. You want to come at me like that. Listen to what I say.
> Q.     Well, Mr. –
> A.     This is not the first time I've been in court, dude.

R. 615-16. After only a few more questions, the already agitated witness became hostile.

> By Mr. Moore:
> Q.     Are you staring at me for a reason, sir?
> A.     No. Have you got any other questions?
> Q.     I'm just asking you a question.
> A.     And I told you no.
> Q.     Okay. Nothing personal. I was asking.
> A.     That's right, nothing personal.

R. 616-17. After this interruption, Mr. Staden resumed cross-examining Thanh Nguyen. The effects of Mr. Moore's interference with this witness' testimony greatly undermined Mr. Staden's self-representation. Mr. Moore's aggravation of the witness was never intended by Mr. Staden and directly deprived Mr. Staden full control of his defense.

Another instance of Mr. Moore's interjection into trial proceedings can be seen in the defendant's cross-examination of Detective Larry Walters. At trial, it was unclear if the detective was testifying from memory or if he had been influenced unduly, so the defendant tried to refresh his memory in order to put the facts as he knew them to be true on the record. During his refresher, Mr. Staden attempted to hand Det. Walters a copy of the report that he had prepared during his investigation of the armed robbery. Instead, standby counsel handed Det. Walters the entirely wrong report. R. 521-22, 526. The confusion created by having interfering counsel undermined Mr. Staden's control of the witness and again impeded the *pro se* defendant's presentation of defense is apparent in the record. R. 527-28. Even the State failed to recognize the defendant's autonomy as his own representative, as it insisted on addressing only Mr. Moore rather than Mr. Staden throughout trial. *See e.g.* R. 531 ("Mr. Traylor: 'Steve, do you have more questions?'").

Likewise, when Dallas Staden took the stand to testify on his own behalf at trial, he did not narrate, as a *pro se* criminal defendant normally would. Rather, Mr. Moore opened Mr. Staden's testimony with questioning. R. 726. The Fifth Circuit was **clear** that no hybrid counsel may exist. *See Lee v. State of Ala.*, 406 F.2d 466, 469 (5th Cir.1968). Mr. Moore should not have inserted himself into Mr. Staden's trial in any way; not only did he interfere with the proceedings but Mr. Moore's actions throughout Mr. Staden's trial frustrated the ends of justice by denying the petitioner his 6th Amendment rights.

Numerous bench conferences were held throughout trial. Each was off the record. Every time, Mr. Staden was left at the defense table, while Mr. Moore approached with the Assistant District Attorney. R 608-619. The impropriety alone would lead a rational trier of fact to conclude the Mr. Staden's case had been prejudiced. The lack of his presence at these bench

51

conferences explicitly deprived Mr. Staden of his right to self-representation and resulted in the effective denial of his Sixth Amendment rights. Further discussions were held in closed chambers, from where the defendant was absolutely excluded. R 606-612. Had Mr. Staden been a licensed attorney, practicing in the State of Louisiana, he would have been invited to these conferences, whether held in chambers or out of chambers, at the bench. The court addressing only one party in a criminal trial undeniably results in an *ex parte* communication. Mr. Staden's absence from these conferences effectively resulted in the court's *ex parte* communications with the State, as the discussions at the bench and in chambers were not held on the record and standby counsel did not reiterate *verbatim* what was said in these conferences to Mr. Staden. Standby counsel's presence in Petitioner's stead further denied Mr. Staden the opportunity to be present at every stage of trial by replacing him ineffectively at these conferences and depriving him of complete control over his defense. Consequently, Mr. Staden was **not** present at every stage of his trial, as he was entitled to be under the Sixth Amendment.

Justice White's *McKaskle* dissent suggests the cumulative actions of standby counsel can result in reversible error, even though individual, seemingly innocuous actions may not.

> Considered in isolation, many types of interference by standby counsel in a *pro se* defense will likely appear inconsequential. The Court's desire to compartmentalize counsel's actions, while understandable, has, in my view, led it to ignore the cumulative effect of counsel's frequent participation on Wiggins' right to defend himself.

*McKaskle v. Wiggins*, 465 U.S. 168, 197, 104 S.Ct. 944, 960-61, 79 L.Ed.2d 122 (1984). The cumulative effect of Mr. Moore's failure to subpoena Mr. Staden's witnesses, repeated off-the-record discussions with the court and State, interjection into direct and cross-examination of witnesses and failure to prepare in any reasonable manner for Mr. Staden's trial deprived Mr. Staden of his right to self-representation and to the right of effective assistance of counsel.

**<u>Unreasonable Application of Clearly Established Federal Law</u>**

>A defendant's right to self-representation plainly encompasses certain specific rights to have his voice heard. The *pro se* defendant must be allowed to control the organization and content of his own defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial.

*McKaskle v. Wiggins*, 465 U.S. 168, 174, 104 S.Ct. 944, 949, 79 L.Ed.2d 122 (1984). Unlike the defendant in *McKaskle*, Mr. Staden was not afforded control over the organization and content of his own defense, specifically by Mr. Moore's interference at trial, namely his interjection into the examination of Thanh Nguyen, leaving him effectively a hostile witness.

>Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, *Chambers v. Mississippi, supra,* or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, *Washington v. Texas,* 388 U.S. 14, 23, 87 S.Ct. 1920, 1925, 18 L.Ed.2d 1019 (1967); *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), **the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense."** *California v. Trombetta,* 467 U.S., at 485, 104 S.Ct., at 2532; cf. *Strickland v. Washington,* 466 U.S. 668, 684–685, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984) ("The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment"). We break no new ground in observing that an essential component of procedural fairness is an opportunity to be heard. *In re Oliver,* 333 U.S. 257, 273, 68 S.Ct. 499, 507–508, 92 L.Ed. 682 (1948); *Grannis v. Ordean,* 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914). That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence. In the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and "survive the crucible of meaningful adversarial testing." *United States v. Cronic,* 466 U.S. 648, 656, 104 S.Ct. 2039, 2045, 80 L.Ed.2d 657 (1984). See also *Washington v. Texas, supra,* 388 U.S., at 22–23, 87 S.Ct., at 1924–1925.

*Crane v. Kentucky*, 476 U.S. 683, 690-91, 106 S.Ct. 2142, 2146-47, 90 L.Ed.2d 636 (1986) (emphasis added). The law is clear: Mr. Staden was entitled to present his own defense, through his own witnesses, without the interference of standby counsel imposed upon him by the trial court. At the outset of his prosecution, Petitioner specifically clarified that he would be in complete control of his defense, yet he was denied these basic rights. R. 296 ("Ms. Hall: He is concerned that he would have a right to fire me if he is not satisfied. **He wants to make certain that he has control over his defense.**").The First Circuit Court of Appeals, the **only** reviewing state court to address any of Mr. Staden's claims, albeit only in a procedural capacity, unreasonably applied clearly established federal law under the Sixth and Fourteenth Amendments to the United States Constitution in finding:

> In this case, the defendant invoked his right to self-representation at the arraignment. The defendant did not object when the trial court appointed standby counsel at the preliminary examination proceeding. As noted by the defendant, he presented his own opening and closing arguments and cross-examined state witnesses, questioned his own witnesses, made motions, argued points of law, and freely addressed the court when required to do so. **There is no indication that the standby counsel deviated from the line of defense set out by the defendant.** The record reveals that standby counsel was an asset to the defendant. The defendant has failed to show he was prejudiced by having been appointed a standby counsel to assist him. Thus, there was no interference with the defendant's right to *pro se* representation in this case. Counseled assignment of error number two lacks merit.

*State v. Staden*, 2011-1455 (La. App. 1 Cir. 5/3/12) (La. App. 1st Cir. May 3, 2012) *writ denied*, 102 So.3d 31 (La. 2012). The First Circuit's decision **directly contradicts** the record, Mr. Staden's claims and clearly established federal law as interpreted by the U.S. Supreme Court. This is undoubtedly an objectively unreasonable interpretation of the facts of Mr. Staden's case *and* an unreasonable application of clearly established federal law, which entitles the criminal defendant alone to control **every** aspect of his defense.

Under the *Faretta* and *McKaskle* line of cases, standby counsel's interference with a defendant's Sixth Amendment rights is unmistakably identifiable upon review. The defendant calls the shots and the unsolicited, appointed advisory attorney cannot overrule or interrupt the defendant's defense strategy or tactics. Where trial counsel interferes at trial, in a representative capacity, a 'hybrid' representation results and the defendant is consequently denied his Sixth Amendment guarantee to conduct his own defense. "[A]lthough he may conduct his own defense ultimately to his own detriment, his choice **must** be honored out of 'that respect for the individual which is the lifeblood of the law.'" *Faretta v. California*, 422 U.S. 806, 834, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975), citing *Illinois v. Allen*, 397 U.S. 337, 350—351, 90 S.Ct. 1057, 1064, 25 L.Ed.2d 353 (emphasis added). Throughout his prosecution and trial, Mr. Staden's choices were **not** honored; they were disregarded, which unequivocally violated his Sixth Amendment rights. Mr. Staden was powerless as a *pro se* litigant. The failure of the state courts to correct this grievous error resulted in the objectively unreasonable application of clearly established federal law, the Sixth Amendment, as interpreted by the U.S. Supreme Court in *Faretta* and *McKaskle*, to the facts of Petitioner's case.

## IV. RIGHT TO FAIR TRIAL VIOLATED/DUE PROCESS VIOLATION

### Federal Law on Right to Fair Trial and Due Process

The accused is guaranteed a fair trial, the right to confront his accusers and compulsory process. U.S. Constitution. Amend. VI. These guarantees are further protected by his right to due process of law. U.S. Constitution. Amend. XIV. "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). The right to a fair trial demands the absence of bias and even extends to the

prevention of the "probability of unfairness." *Ibid*. The Fifth Circuit echoed this rule in *U.S. v. Crouch*,

> "[H]istorically, this guarantee of due process has been applied to **deliberate** decisions of government officials to deprive a person of life, liberty, or property," *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986), and hence "the Due Process Clause ... is not implicated by the lack of due care of an official causing unintended injury to life, liberty or property."

84 F.3d 1497, 1513 (5th Cir. 1996). The United States Supreme Court has explicitly identified the denial of due process as follows:

> [D]enial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that **the absence of that fairness fatally infected the trial**; the acts complained of must be of such quality as necessarily prevents a fair trial.

*Lisenba v. People of State of California*, 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166 (1941) (emphasis added). Thus, due process is denied when the trial itself is found to be lacking in fairness. *Ibid*. While a defendant may not be entitled to a perfect trial, he is certainly entitled to a fair one. *See Bruton v. U.S.*, 391 U.S. 123, 135 (1968); *Lutwak v. United States*, 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593. This extends to the court's reception of evidence and testimony fairly, so that a conviction is not derived from determination to convict.

> The case was tried in such a way that the jury, in considering as a whole the judge's questions and charge, might well have reached the conclusion that he was not impartial, but was insisting upon a conviction. **It is vastly more important that the attitude of the trial judge should be impartial than that any particular defendant, however guilty he may be, should be convicted.** It is too much to expect of human nature that a judge can actively and vigorously aid in the prosecution and at the same time appear to the layman on the jury to be impartial.

*U.S. v. Hoker*, 483 F.2d 359, 368 (5th Cir. 1973).

A crucial component of due process is the confrontation and presentation of witnesses.

56

> Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. **This right is a fundamental element of due process of law.**

*Taylor v. Illinois*, 484 U.S. 400, 409 (1988), citing *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967) (emphasis added). The denial of a defendant's right to present one's own witnesses results in the denial of the right to present favorable evidence in his defense. "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Furthermore, the failure to disclose pertinent evidence relative to the trial court's determination of the credibility of the witness directly deprives the criminal defendant of the right to a fair trial.

## Facts In Support of Grounds for Relief

### The Assistant District Attorney's cumulative actions violated Mr. Staden's right to a fair trial.

This subsection adopts and incorporates by reference thereto the preceding facts and argument of prosecutorial misconduct depriving Mr. Staden of his rights to due process of law and a fair trial. The aforementioned misconduct alleged by the defendant, combined with the actions of the Assistant District Attorney throughout the prosecution of this case accrued to nothing less than a gross infringement upon Mr. Staden's constitutional rights. The cumulative actions of the State in Mr. Staden's prosecution denied him a fair trial.

### The actions of the trial court violated Mr. Staden's right to a fair trial.

"When a case is tried without a jury, it is reasonable to expect the judge to make an extra effort to be fair and avoid even the appearance of unfairness." *Hawkins v. LeFevre*, 758 F.2d 866, 879 (2d Cir. 1985). "Not only is a biased decisionmaker [sic] constitutionally unacceptable but 'our system of law has always endeavored to prevent even the probability of unfairness.'"

*Withrow v. Larkin*, 421 U.S. 35, 47 (1975), citing *In re Murchison*, supra, 349 U.S., at 136, 75 S.Ct., at 625; *cf. Tumey v. Ohio*, 273 U.S. 510, 532, 47 S.Ct. 437, 444, 71 L.Ed. 749 (1927). The trial court, in Mr. Staden's case, exhibited bias early on in the prosecution.

After having to remind the court four times of his intent to represent himself, Mr. Staden was then subjected to the appointment and later recusal of the Public Defender's Office. R. 292, 303, 309, 315, 392-94.

| | |
|---|---|
| The Court: | Mr. Staden, I am going to appoint another lawyer to represent you. You keep telling me you want to represent yourself. We have danced this tune. **I thought I had talked you out of it** one time and now you want to go back and do it again. I mean, is that what you want to do? |
| The Defendant: | Yes, sir, it is. I do not want another lawyer. |

R. 394 (emphasis added). The court clearly intended to appoint representation to Mr. Staden, regardless of his wishes and in complete spite of his Sixth Amendment rights. Mr. Staden's refusal to accept any such appointment resulted in personal conflict between the trial court and the petitioner. The trial court's demeanor almost every time it addressed Mr. Staden was that of sheer irritation; a plain reading of the record, corroborated by the witness letters addressed to the trial court (attached as Exhibits 1-4), indicates the trial court in fact did not like Dallas Staden. A personal distaste for someone, however, should not sway the court in any direction, **especially when a criminal defendant is <u>presumed innocent.</u>**

In its ruling, the trial court repeatedly confused the State's witnesses, referring to Thanh Nguyen as Sam Tran's brother. R. 799 ("Mr. Tran and his brother, who got a little heated...") ("So I have to weigh that testimony with the testimony of his brother…"). This confusion indicates the trial court's failure to grasp the facts as presented by the State's witnesses, since, **at no point** during the trial did either Sam Tran or Thanh Nguyen testify as to their relationship,

beyond that of coworkers. In fact, Nick Tran, the owner of Alby's on the date of offense and brother of Sam Tran, was not even present during the armed robbery. The gun Nguyen used to chase the perpetrators out of the store while Dallas Staden remained behind to untie Tran and seek medical assistance for him was owned by Nick Tran. R. 548.

Additionally, the trial court refused to entertain the rereading of testimony by the court reporter when Thanh Nguyen testified as to Mr. Staden fleeing in the red Mazda with his older brother and the unknown gunmen. R. 612. Nguyen was **the only** witness who testified to seeing the defendant leave with the armed robbers and his testimony was inconsistent and confusing. Throughout Nguyen's testimony, both the Assistant District Attorney **and** Mr. Steven Moore were disconcerted. Nguyen testified falsely as to Mr. Staden arriving in the red car, with the perpetrators. This false testimony was nearly impeached by the defendant at trial, but for the trial court's interference with his impeachment. In an instance in which both the State and the defense were confounded by the State's witness' testimony, the trial court presumably would have likewise been puzzled. However, the court apparently was not.

| | |
|---|---|
| Mr. Moore: | Yeah. It – there's a question that Mr. Staden asked the gentleman: Are you as sure about me getting out of the red car as you are about me getting in the red car? And he said yes. |
| Mr. Traylor: | I'd like to find the point where he said he got out of the red car. I mean, where is that at? |
| Mr. Moore: | He said that, too? |
| Mr. Traylor: | What's that? I – |
| Mr. Moore: | He – that he said that? |
| Mr. Traylor: | Yeah. I'd like that. |
| Mr. Moore: | Yeah. That's the point I'm asking – |
| Mr. Traylor: | That – |
| Mr. Moore: | Or – Or even ahead of that. |
| The Court: | I'm – |
| Mr. Traylor: | Right. |
| **The Court:** | **I'm not going to allow this rereading of testimony.** |
| Mr. Moore: | Okay. |

> The Court:   I heard what he said.
> Mr. Moore:   Okay.
> The Court:   You can ask him whatever questions you'd like to ask him.
> Mr. Moore:   All right. That's fine.
> Mr. Staden:   Okay.

R. 611-12 (emphasis added). The witness went on to testify that he, in fact, **never** saw Mr. Staden exit the white Ford Explorer in person but rather watched it on video several days after the armed robbery. R. 612. Any testimony Nguyen offered relative to Mr. Staden arriving or leaving in a car was **not** firsthand observation testimony. In fact, the windows of Alby's storefront were so obscured by large, cardboard signs that he effectively could not have seen Mr. Staden leaving in **any** car from within Alby's. R. 609. The trial court apparently took the witness' testimony at face value, referring to Nguyen's testimony in its oral reasons for convicting Mr. Staden of Armed Robbery:

> **He was very honest**; and he said to Mr. Staden, had I known you were in on it then, you'd have never left that store because I had a gun and I'd have shot your ass. I think that's exactly what he said. And he said I saw you get in that car and, when I saw you get in that car, I knew you were involved. So I have to weigh that testimony with the testimony of his brother who said – and both of them said – that Mr. Staden said, whoa, I'm just a customer, I'm just a customer.

R.798-801 (emphasis added). Mr. Staden attempted to impeach Nguyen's red car testimony not only when he was on stand but also during the cross-examination of Detective Brian Higginbotham. R. 655, 672. At the close of the petitioner's cross-examination of Det. Higginbotham, the State objected and the Court sustained the objection.

> Q.            [Thanh Nguyen] never told you I got in a red car?
> Mr. Traylor:   Asked and answered, your honor.
> The Court:    I've – **I've heard that a million times, Mr. Staden.**

R. 672 (emphasis added). Despite Mr. Staden's impeachment attempts, the court still found Nguyen credible and "honest." R. 799. The trial court convicted Mr. Staden of Armed Robbery after hearing that same witness testify that the **only** reason he believed Mr. Staden was involved in the armed robbery was because of his familial relationship to Jeffrey Staden. R. 630. This is a tune the court heard from both of the State's eyewitnesses, Thanh Nguyen and Sam Tran, as Tran also testified that he only believed Mr. Staden was involved **after** law enforcement informed him that Dallas Staden and Jeffrey Staden are brothers. R. 563, 575-77.

In his closing argument, Mr. Staden urged the entire armed robbery was in fact a drug deal, of which he had no prior knowledge, gone wrong. R. 792. Without understanding the rules of evidence or criminal procedure, as a *pro se* defendant, Mr. Staden offered as proof in support of his contention the remainder of the security footage of the parking lot introduced originally, in part only, by the State. R. 792.

| | |
|---|---|
| The Court: | I saw what – I saw what you saw in this courtroom. That's all I saw. |
| By Mr. Staden: | Right, but I'm saying – |
| The Court: | I haven't seen anything other than that. |
| By Mr. Staden: | Right, the – the – the entire video I'm saying. We – we – he said we could publish the whole video. |
| The Court: | I saw what was in evidence and that's all I saw. **That's all I'll ever see.** |

R. 792 (emphasis added). This is, perhaps, all the trial court would ever see because the trial court **refused** to let Mr. Staden introduce the video in its entirety. R. 737. The State recognized the defendant's right to publish the entire video in his case in chief. R. 592. In fact, the trial court told the defendant during his testimony that he could not play the video while he testified but he **could** play the **entire** video in his closing argument. R. 737. At that point, any video he tried to play during closing would have been merely demonstrative and not the introduction of evidence,

as the defendant clearly intended, an intention which State recognized. R. 592. That is exactly

what the court then **refused** to allow in closing. R. 792.

The trial court's oral reasoning for finding Mr. Staden guilty of Armed Robbery read, in

pertinent part:

> I have listened to all of the testimony in the case. There is no
> question in my mind, from the facts that I have seen, that an armed
> robbery was committed. Mr. Tran and his brother both testified
> that they were tied. Mr. Tran was shot, hit in the head, tie wrapped.
> Money was taken from him. Absolutely no question that there was
> an armed robbery. I am convinced that the person who had the gun
> who shot and hit Mr. Tran intended to kill him. Based upon
> everything that I've heard, there is no question of that. **The
> question is: What was Dallas Staden's involvement? There was
> no question he was there.** There was no question he tied up both
> of the men. There's no question he put a bag over Mr. Tran's head.
> So how do you determine those things? **How does a judge
> determine those things?**

R. 798-99. The Court's indecision, wavering on the record as to what evidence warranted to a

conviction of guilt **beyond a reasonable doubt**, presented the appearance of partiality. As

warned against in *Hoker*, *supra*, the language of the Court in Mr. Staden's case suggested the

insistence of a conviction, rather than a conviction of guilt beyond a reasonable doubt. The

burden of guilt beyond a reasonable doubt is such that only complete conviction should render a

once free man incarcerated for nearly the remainder of his natural life. Had Jeffrey Staden not

been involved in the December 1, 2009 armed robbery of Alby's, would Dallas Staden have been

convicted?

The trial court's language towards Mr. Staden, describing him repeatedly as "a con," "a

con man extraordinaire" and "too smart for his own good," demonstrated its inability to remain

impartial. R. 800. The court listed the myriad ways it found Mr. Staden to be a so-called con man

extraordinaire, pertinently:

> He tried to con the police and he, also, tried to con Mr. Tran and his brother by faking to be an innocent bystander. **Who's the brains behind this outfit?** You know, I'm not sure I realized it to its fully import until he testified and until his closing argument, until I realized that **the big con job that he really thought he was pulling by waiving a jury is he could outsmart the court**.

R. 800-01 (emphasis added). Ultimately, the court's reasons for ruling suggested a finding of guilt by association.

> Had Mr. Tran died…you would have been guilty of Second Degree Murder; but…Attempted Second Degree Murder requires a specific intent to kill. And, based on the evidence, I'm not sure beyond a reasonable doubt that **you intended for your brother** to shoot him or kill him.

R. 801.

The trial court could not articulate its reasons for finding Dallas Staden guilty of Armed Robbery beyond its general mistrust of, irritation with and apparent personal disdain for the defendant. Disliking or mistrusting someone is **not** the equivalent of evidence supporting a finding of guilt beyond a reasonable doubt. *In toto*, the actions and demeanor of the trial court amounted to the effective denial of the defendant's right to a fair trial, as in the very least, the trial court exhibited the appearance of partiality.

Standby counsel's dismissal of Mr. Staden's lay witnesses violated his right to a fair trial.

This subsection adopts and incorporates by reference thereto the preceding facts and argument of standby counsel's deprivation of Mr. Staden's rights to due process of law and a fair trial, in addition to the Sixth Amendment violations. Ultimately, Mr. Steven Moore's cumulative actions throughout Mr. Staden's case amounted to a complete denial of Mr. Staden's right to a fair trial as Mr. Staden was ultimately deprived of the opportunity to control his own defense.

**Unreasonable Application of Clearly Established Federal Law**

The State's cumulative actions deprived the defendant of the right to a fair trial and the right to due process of law. The higher courts, by denying Mr. Staden's claims on procedural grounds, failed to finally adjudicate the same. Consequently, the state courts failed to apply clearly established federal law, resulting in the miscarriage of justice in this case.

The trial court's imposition of standby counsel, general demeanor towards the defendant, unwillingness to allow the defendant to introduce video evidence and refusal to permit the impeachment of Thanh Nguyen's testimony and the correction of his false testimony all amounted to an unreasonable application of Dallas Staden's right to due process of law and his right to a fundamentally fair trial. Obtaining a conviction should never take precedent over the preservation of justice.

Standby counsel's **dismissal** of lay witnesses for the defense violated Mr. Staden's constitutionally guaranteed rights, namely those to a fair trial, to due process of law, to present his own defense, to control his own defense and to call witnesses on his own behalf. The higher courts' upholding of Mr. Staden's conviction despite these violations amounts to the unreasonable application of clearly established federal law, as the Sixth and Fourteenth Amendments have been interpreted consistently to guarantee the aforementioned rights to the criminal defendant.

The state courts failed to grant relief for these errors, even though federal law provides avenues of relief through appeal and post-conviction process. The failure to do so resulted in an undeniable injustice done to the defendant, as he is now subject to imprisonment at hard labor for a period of 49.5 years.

## **CONCLUSION**

From the outset of his proceedings, Petitioner consistently maintained his innocence, from the commencement of prosecution through sentencing. *See e.g.* R. 295, 835 and Dallas Staden's Pretrial Letter to Judge Marabella. The witnesses present at Alby's on the morning of the armed robbery concurred: they did not believe Mr. Staden was involved until *after* law enforcement interviewed them and disclosed his relationship to the armed robber, Jeffrey Staden. R. 562-63, 576 (Sam Tran testified that he knew Dallas Staden well and did not believe he was involved with the armed robbery until law enforcement questioned him specifically about the defendant and informed Tran of the Staden brothers' familial relationship) and 618 (Thanh Nguyen testified that had he thought at the time of the robbery that Mr. Staden was involved, he would have shot him right then and there; he did not believe Mr. Staden was involved in the robbery). In fact, both State witnesses, Sam Tran and Thanh Nguyen testified to Mr. Staden hiding in the stairwell to the Alby's office during the armed robbery. R. 567, 617-18. Nonetheless, the cards were stacked against Dallas Staden. No deprivation of rights can be considered minute and when the number of violations accrue, as they did in Mr. Staden's case, the resulting prejudice becomes impossible to ignore.

Perhaps every seemingly innocuous misstep in Mr. Staden's case could have been deemed harmless error individually. However, combined, all errors in Mr. Staden's case resulted in his prejudice at trial, deprivation of rights and wrongful conviction.

The Court of Appeal, First Circuit, and the Louisiana Supreme Court unreasonably applied clearly established federal law by failing to adjudicate Mr. Staden's claims on their merits in both direct appeal and post-conviction proceedings. This adjudication on procedural grounds resulted in the fundamental miscarriage of justice. Should this Honorable Court likewise

refuse to entertain Mr. Staden's claims on their merits, the fundamental miscarriage of justice will result and Mr. Staden's conviction shall stand in spite of his constitutionally guaranteed rights.

The State violated *Brady* and its progeny by failing to correct knowingly false testimony, failing to disclose the pending criminal investigation of its star witness and aiding in the wrongful dismissal of Mr. Staden's lay witnesses without Mr. Staden's knowledge or consent. The State's actions amount to reversible error. The trial court and higher courts, in their reviewing capacities, failed to right the wrongs against Mr. Staden, consequently failing to apply the principles of *Brady* and thus applying clearly established federal law unreasonably.

Mr. Staden's standby counsel at trial, Mr. Steven Moore, deprived Mr. Staden of his Sixth Amendment rights as guaranteed by the U.S. Constitution. The trial court's appointment of Mr. Moore rendered Mr. Moore ineffective by the very nature of standby counsel and the strict limitations imposed upon such 'representation.' Mr. Moore's unpreparedness and, frankly, his inability to prepare in any meaningful manner prior to trial due to his quick appointment, rendered him ineffective as advisory counsel to Mr. Staden. Mr. Moore's actions at trial, specifically holding bench and chambers conferences with the State and the trial court without Mr. Staden's presence and interjecting, examining and cross-examining witnesses at trial, interfered with Mr. Staden's autonomy and self-representation. Mr. Moore's failure to subpoena Mr. Staden's witnesses deprived Mr. Staden of the rights to present favorable evidence, to present a full defense and to control his defense. Mr. Moore's outright, unauthorized dismissal of Mr. Staden's defense witnesses, who appeared voluntarily and were dismissed without Mr. Staden's consent or knowledge, violated Mr. Staden's right to control his own defense and present a full defense, in addition to his right to call witnesses on his own behalf. The trial

court's imposition of Mr. Moore on Mr. Staden's defense violated Mr. Staden's Sixth Amendment rights in myriad ways. The reviewing courts, in failing to correct the erroneous appointment of Mr. Moore and the resulting errors, unreasonably applied clearly established federal law as interpreted by the U.S. Supreme Court in *Faretta* and *McKaskle*.

Cumulatively, the actions of Mr. Staden's standby counsel, the State and the trial court interfered with, violated and denied Mr. Staden his constitutionally guaranteed rights. Consequently, his case was seriously prejudiced, he was convicted of Armed Robbery and is now serving a sentence of 49 and ½ years at hard labor, without benefit of probation, parole or suspension of sentence.

WHEREFORE, for the reasons stated above, Petitioner prays for an evidentiary hearing on the merits of the claims raised in this petition and for all equitable relief to be granted on the same foregoing claims.

RESPECTFULLY SUBMITTED:

**MANASSEH, GILL, KNIPE & BÉLANGER, P.L.C.**

s/ Caitlin M. A. Chugg
CAITLIN M. A. CHUGG
Louisiana State Bar Roll No. 35708
8075 Jefferson Highway
Baton Rouge, LA 70809
Tel: (225) 383-9703
Fax: (225) 383-9704
Email: caitlin@manassehandgill.com
*Attorney for Dallas Staden*

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**DALLAS STADEN,**                                    **CIVIL ACTION**
                **Petitioner,**

                                                      **NO. 3:16-cv-00310**
**v.**

**TROY PORET, Warden,**
                **Avoyelles Correctional Center,**
                **Cottonport, LA**
                **Respondent**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on May 6, 2016, a copy of the foregoing Petition for Writ of

Habeas Corpus Under 28 U.S.C. § 2254 By a Person in State Custody was filed electronically

with the Clerk of Court using CM/ECF system. I also certify that I have mailed by United States

Postal Service this filing to the following:

Honorable Judge Anthony J. Marabella, Jr.
19th Judicial District Courthouse
300 North Blvd., Suite 8201
Baton Rouge, LA 70801

Commissioner Nicole Robinson
19th Judicial District Courthouse
300 North Blvd., Suite 2102
Baton Rouge, LA 70801

Mr. Jeff Landry, Attorney General
P.O. Box 94005
Baton Rouge, LA 70804-9005

Mr. Hillar C. Moore, III, District Attorney
222 St. Louis Street, Suite 550
Baton Rouge, Louisiana 70802

Mr. Troy Poret, Warden
Avoyelles Correctional Center
1630 Prison Road
Cottonport, LA 71327


RESPECTFULLY SUBMITTED:

**MANASSEH, GILL, KNIPE &
BÉLANGER, P.L.C.**

s/ Caitlin M. A. Chugg                      
CAITLIN M. A. CHUGG
Louisiana State Bar Roll No. 35708
8075 Jefferson Highway
Baton Rouge, LA 70809
Tel: (225) 383-9703
Fax: (225) 383-9704
Email: caitlin@manassehandgill.com
*Attorney for Dallas Staden*